Docket No. 96978–Agenda 15–May 2004.

CENTRAL ILLINOIS LIGHT COMPANY, Appellee, v. THE HOME INSURANCE COMPANY
 et al.
, Appellants.

Opinion filed December 2, 2004.

JUSTICE GARMAN delivered the opinion of the court:

Plaintiff Central Illinois Light Company (CILCO) filed suit against its excess liability insurers for indemnification of funds expended to investigate and remediate environmental contamination at several sites that formerly housed manufactured gas plants (MGPs). Defendant insurers filed nine motions seeking summary judgment or partial summary judgment. The circuit court granted five of these motions and denied four.

Interlocutory cross-appeals were taken to the appellate court pursuant to Rule 308 (155 Ill. 2d R. 308). CILCO appealed the circuit court’s orders granting three of the summary judgment motions, one of which was the dismissal of claims based on coverage contained in policies written in 1948-57 and 1974-85. CILCO was unable to locate the actual policies, but offered secondary evidence of these writings, which the circuit court found inadmissible. In addition, the circuit court denied CILCO’s motion for additional discovery of standard or sample policy language in use by the defendants at these times. CILCO also raised this issue on appeal. Defendants cross-appealed the circuit court’s denial of three of their summary judgment motions.

The appellate court reversed the circuit court’s order granting summary judgment in favor of the defendants on the issue of indemnity. In addition, the appellate court reversed the circuit court’s judgment on the missing policy issues. The appellate court affirmed a ruling dealing with CILCO’s claim for legal expenses in litigation that is not at issue in the present appeal. Finally, the appellate court declined to review defendants’ appeals from the denial of three summary judgment motions. 342 Ill. App. 3d 940, 965.

We granted defendants’ petitions for leave to appeal pursuant to Rule 315(a) (177 Ill. 2d R. 315(a)). Pursuant to Supreme Court Rule 345 (155 Ill. 2d R. 345), we have permitted the Complex Insurance Claims Litigation Association to file a brief 
amicus curiae
 on behalf of the defendants. We have also permitted the Illinois Energy Association, the Illinois Environmental Regulatory Group, Northern Illinois Gas Company, Kraft Foods North America, Inc., the Builders Association of Greater Chicago, the Northern Illinois Building Contractors Association, Illinois Tool Works, Inc., the Illinois State Fabricare Association, the Land of Lincoln Drycleaners Association, Inc., and the Chicagoland Cleaners Association to file briefs 
amici curiae
 on behalf of the plaintiffs.

BACKGROUND

Plaintiff CILCO is the owner of several properties in the State of Illinois that formerly housed MGPs, including sites located at MacArthur Boulevard (MacArthur) and First and Washington Streets (First and Washington) in Springfield and Persimmon Street (Persimmon) in Peoria. Gas was manufactured at these facilities from the 1850s through the 1930s, using processes that created coal tar as a by-product. The coal tar was recovered, stored in underground containment structures, and sold. By the middle of the twentieth century, MGPs were being rendered obsolescent by the advent of natural gas pipelines. CILCO dismantled the First and Washington site in the late 1920s and the MacArthur and Persimmon sites in the early 1950s. At each site, the cover of the containment structure was removed and most of the remaining coal tar was extracted for sale. However, significant amounts of tar remained in the structures, which were filled in with construction debris and other materials. Over time, the structures leaked and the surrounding soil and groundwater were contaminated.

In 1985, CILCO received a report prepared by the Radian Corporation in conjunction with the United States Environmental Protection Agency (EPA), which described the potential for environmental contamination at former MGP sites. CILCO began to investigate its properties and identified three former MGP sites that it then owned, the MacArthur, First and Washington, and Persimmon locations. Visual inspection of these sites revealed no evidence of contamination. However, in 1986, discolored and odorous soil was discovered at the MacArthur site by workers excavating to install an underground storage tank. CILCO investigated and eventually determined that tar constituents were present in the soil.

Shortly thereafter, the Illinois Environmental Protection Agency (IEPA) held a meeting for the heads of the environmental departments at various Illinois utilities to discuss potential environmental contamination at more than 100 MGP sites throughout the state. The record contains the affidavit of a former CILCO environmental engineer in which he states that at the meeting the utilities were informed that they were strictly liable, under state and federal law, for environmental contamination at MGP sites. Further, the companies were informed that although the IEPA could bring suit to compel investigation and remediation of the sites, the companies could act voluntarily under the supervision of the agency. The IEPA officials presenting this information also informed the utilities that they could deal with this liability “the easy way or the hard way.”

CILCO’s subsequent expenditures to investigate and remediate the contamination of its MGP sites were not the result of a judgment following adjudication of liability or of a settlement reached after the initiation of an enforcement action. Rather, CILCO entered into a voluntary agreement with the IEPA in 1987, pursuant to the Pre-Notice Site Cleanup Program (Pre-Notice Program). The Pre-Notice Program was established pursuant to a provision of the Environmental Protection Act (Act) that permitted the IEPA, upon the request of the owner or operator, to provide review and evaluation services at a site where hazardous substances might be present, and to supervise the voluntary cleanup of the site. 415 ILCS 5/22.2(m)(1) (West 1994). Under the agreement between CILCO and the IEPA, agency guidelines and instructions governed the cleanup work. All work plans required agency approval. In addition, the IEPA regularly billed CILCO for its costs in overseeing the investigation and remediation. In 1995, the Pre-Notice Program was replaced with the Site Remediation Program (415 ILCS 5/58
 et seq. 
(West 1996)), which also provides for voluntary cleanup of certain types of sites under IEPA oversight. Eventually, the IEPA sent “No Further Action” letters to CILCO, informing it that it was released from “further responsibilities under the Act for performance of the approved remedial action” with regard to certain sites.

This litigation followed when CILCO sought indemnification from its excess insurers for its expenditures related to investigation and remediation of the sites. Defendants included the Home Insurance Company (Home) and certain other London market insurers (referred as the CLMI) from whom CILCO purchased excess liability policies between 1948 and 1985. It is the construction of the language of the CLMI policies that is at issue in the present case.

From 1957 through 1971, the CLMI policies provided that the insurers would “indemnify [the insured] for any and all sums which the Insured 
shall by law become liable to pay and shall pay
 or by final judgment be adjudged to pay, or which by agreement between the Insureds and the Underwriters, or their representatives shall be paid to any person, firm *** 
as damages
 *** to property.” (Emphases added.)

Later policies contained different language. After 1979, “lower layer” policies required CLMI to indemnify CILCO “for all sums which the Assured 
shall be obligated to pay by reason of the liability
: (a) 
imposed
 upon the Assured 
by law
, or (b) 
assumed under contract or agreement 
with the Named Assured 
for damages
 on account of: (i) Bodily Injury [or] (ii) Property Damage caused by or arising out of each occurrence happening within the United States of America.” (Emphases added.) The “higher layer” policies after 1979, in relevant part, use the same or similar language.

The policy definition of “ultimate net loss” also changed over time. In the earlier policies, “ultimate net loss” was defined as “the sums for which the Insured 
is liable
 in
 settlement
 of an occurrence.” (Emphases added.) The later policies defined the term as “the total sum which the Assured *** become[s] 
obligated to pay
 by reason of bodily injuries or 
property damage claims
, either through adjudication or compromise, excluding all expenses and costs.” (Emphases added.)

In its order granting partial summary judgment to CLMI, the circuit court concluded that it was bound by the decision of the appellate court in 
Zurich Insurance Co. v. Carus Corp.
, 293 Ill. App. 3d 906 (1997). After hazardous substances were found in the soil and groundwater at its chemical manufacturing facility, Carus sought admission to the IEPA Site Remediation Program in an effort to avoid being placed on the EPA’s National Priorities List of sites targeted for cleanup. 
Carus
, 293 Ill. App. 3d at 907. Following acceptance into the program, Carus was required to conduct an investigation and study under the supervision of the IEPA, which the IEPA then used to determine what remedial action was needed to comply with federal and state environmental laws. 
Carus
, 293 Ill. App. 3d at 908. Zurich and other liability insurers denied coverage for Carus’ consulting fees and investigation expenses and filed a declaratory judgment action in which the issue was whether they were required to indemnify Carus for expenses incurred while participating in the voluntary IEPA program. The insurance policies at issue contained both a duty to defend against “suits against the insured seeking damages” and a duty to indemnify the insured for all sums that the insured became “legally obligated to pay as damages” due to bodily injury and property damage caused by an occurrence. 
Carus
, 293 Ill. App. 3d at 907.

Affirming the circuit court’s judgment that Zurich and the other insurers had no duty to indemnify Carus, the appellate court relied on this court’s decision in 
Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.
, 166 Ill. 2d 520 (1995). In 
Lapham-Hickey
, as in 
Carus
, the applicable insurance policy used the term “suit” in its description of the purchased coverage. The policy required the insurer “to defend any suit against the Insured alleging liability for such damage.” 
Lapham-Hickey
, 166 Ill. 2d at 528. This court concluded that 
Lapham-Hickey
’s voluntary investigation of soil and groundwater contamination did not trigger the insurer’s duty to defend because no suit was ever brought against the company. 
Lapham-Hickey
, 166 Ill. 2d at 531-32. The
 Carus
 court similarly concluded that because no suit was ever brought against Carus, the carriers had no duty to defend in that case either. 
Carus
, 293 Ill. App. 3d at 909. Further, because there was no duty to defend, there was no duty to indemnify. 
Carus
, 293 Ill. App. 3d at 909-10, citing 
Crum & Forster Managers Corp. v. Resolution Trust Corp.
, 156 Ill. 2d 384, 398 (1993). In addition, no duty to indemnify was created by the “legally obligated to pay” language because “no document Carus ever received in this matter asserted such an obligation,” and Carus “initiated its involvement in the program voluntarily by petitioning the IEPA.” 
Carus
, 293 Ill. App. 3d at 910.

Reversing the circuit court, the appellate court in the present case distinguished 
Carus 
and 
Lapham-Hickey
 on several grounds. First, the appellate court noted that CLMI did not contract to provide comprehensive general liability (CGL) insurance that included a duty to defend CILCO. Rather, CLMI provided only excess liability coverage. 342 Ill. App. 3d at 957-58. Under no circumstances would CLMI have had a duty to defend, even if a lawsuit had been filed against CILCO. When only indemnification is contracted for, making a duty to indemnify contingent on the existence of a duty to defend is illogical and defeats the purpose of the policy. Second, the appellate court observed that, unlike the policies at issue in 
Carus
 and 
Lapham-Hickey
, the CLMI policies it was called upon to construe did not contain the term “suit.” 342 Ill. App. 3d at 951. Third, the appellate court framed the “legally obligated to pay as damages” inquiry as whether CILCO “face[d] legal liability for environmental response costs,” rather than as whether the obligation arose from adjudication or settlement of a suit. 342 Ill. App. 3d at 954.

ISSUES PRESENTED

We must determine whether the appellate court properly construed the policy language to determine, first, that the filing of a lawsuit or administrative complaint is not a condition precedent to CLMI’s duty to indemnify (342 Ill. App. 3d at 953), second, that CILCO was legally obligated to undertake a cleanup of the sites (342 Ill. App. 3d at 954), and, third, that CILCO’s expenditures in doing so constituted “damages” (342 Ill. App. 3d at 960-61).

CLMI argues that (1) the policy language and the case law construing similar language clearly require a lawsuit or other adversarial proceeding, such as an administrative complaint, before its duty to indemnify arises; (2) in the absence of a lawsuit, CILCO was not “legally obligated” to undertake a cleanup of the MGP sites; (3) CILCO’s expenditures to investigate and remediate the MGP sites did not constitute the payment of “damages”; and (4) public policy supports interpretation of insurance contracts as written, without expanding the insurer’s duty to indemnify to encompass voluntary expenditures by the insured for business or public relations purposes.

CILCO’S MOTION TO STRIKE

This court granted defendants’ petition for leave to appeal to determine whether the appellate court properly held that the defendants are obligated, under the language of the relevant insurance policies, to indemnify CILCO for the costs of investigation and remediation of the MGP sites.

In their brief to this court, however, defendants raise an additional issue–whether the appellate court was correct when it reversed the circuit court’s rulings regarding certain “missing policies.” The issue raised with regard to the missing documentation has two parts. First, CILCO offered secondary evidence to demonstrate what the missing documents were likely to have contained. Second, CILCO sought additional discovery of sample or specimen policy language that defendants were using at the relevant times. The circuit court rejected the secondary evidence and denied the request for additional discovery. 342 Ill. App. 3d at 947-48. The appellate court reversed both rulings. 342 Ill. App. 3d at 961-62.

CILCO’s motion to strike the portion of defendants’ brief addressing the evidentiary and discovery issues was taken with the case. We now grant the motion to strike.

Supreme Court Rule 315(b)(3) requires that a petition for leave to appeal contain “a statement of the points relied upon for reversal of the judgment of the Appellate Court.” 177 Ill. 2d R. 315(b)(3). A party’s failure to raise an issue in the petition for leave to appeal may be deemed waiver of that argument. 
Federal Deposit Insurance Corp. v. O’Malley
, 163 Ill. 2d 130, 154 (1994).

Waiver is a limitation on the parties and not on the jurisdiction of this court. Thus, even when a party has failed to raise an issue in its petition for leave to appeal, we may choose to address it in the interest of preserving a sound and uniform body of precedent. 
People v. Hamilton
, 179 Ill. 2d 319, 323 (1997). In the present case, however, we see no justification for making such an exception to the general rule of waiver. The evidentiary and discovery issues do not affect our analysis of the issue raised in the petition for leave to appeal. In addition, permitting CILCO to offer relevant and probative secondary evidence does nothing more than enable it to argue to the trier of fact that certain policy language was in effect at certain times. Permitting additional discovery will ensure, to the extent possible, that the actual policy language in effect at relevant times will be in evidence.

ANALYSIS

The circuit court’s entry of summary judgment is subject to 
de novo
 review. 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102 (1992). The construction of an insurance policy, which is a question of law, is also reviewed 
de novo
. 
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479-80 (1997).

When construing the language of an insurance policy, a court’s primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy. 
Crum & Forster
, 156 Ill. 2d at 391. An insurance policy, like any contract, is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose. 
Martindell v. Lake Shore National Bank
, 15 Ill. 2d 272, 283, 154 N.E.2d 683 (1958). If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning.
 Outboard Marine
, 154 Ill. 2d at 108. However, if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter. 
Outboard Marine
, 154 Ill. 2d at 108-09. Further, as the appellate court has so often stated, an ambiguity will be found if the language of the contract is “obscure in meaning through indefiniteness of expression.” 
Platt v. Gateway International Motorsports Corp.
, 351 Ill. App. 3d 326, 330 (2004); see also 
Meyer v. Marilyn Miglin, Inc
., 273 Ill. App. 3d 882, 888 (1995). A contract is not rendered ambiguous merely because the parties disagree on its meaning. 
Johnstowne Centre Partnership v. Chin
, 99 Ill. 2d 284, 288 (1983). On the other hand, a contract is not necessarily unambiguous when, as here, each party insists that the language unambiguously supports its position. Rather, whether a contract is ambiguous is a question of law. 
Quake Construction, Inc. v. American Airlines, Inc.
, 141 Ill. 2d 281, 288 (1990).

1. Requirement of a Lawsuit

Under the 1957-71 policy language, indemnification is provided under any one of three circumstances: (1) the insured’s becoming liable to pay and, in fact, paying damages, or (2) a final judgment awarding damages, or (3) an agreement between the insured and the underwriters to pay damages. In the present case, because there has been no final judgment, and because CLMI was not a party to any agreement, only the first of these three options is potentially applicable.

CLMI argues that in the first option, the language “liable to pay *** as damages” necessarily connotes the need for suit and, further, “suggests that a court judgment is necessary.” This simply cannot be the case. If a court judgment is necessary to trigger a duty to indemnify under the “becoming liable to pay” term, then the “final judgment” term is mere surplusage. See 
Dowd & Dowd, Ltd. v. Gleason
, 181 Ill. 2d 460, 479 (1998) (courts will generally avoid interpretations that render contract terms surplusage); 
Outboard Marine
, 154 Ill. 2d at 123 (courts must strive to give each term in the policy meaning unless to do so would render the clause or policy inconsistent or inherently contradictory). Thus, a court judgment imposing damages is sufficient to trigger the duty to indemnify, but, under the plain language of the policy, is not necessary.

Under the later policies, indemnification is provided if the insured is obligated to pay damages by reason of a liability either (1) imposed by law or (2) assumed under contract or agreement. Unlike the earlier policies, the underwriters’ participation in such an agreement is not required.

Thus, if the amounts paid by CILCO to investigate and clean up the contamination constitute “damages,” CILCO is entitled to indemnification if the liability for such damages is either imposed by law (under both the earlier and later policies) or assumed by agreement (under the later policies). The policies do not define the terms “damages,” “obligated,” “liable to pay,” or “imposed by law.” Moreover, the plain, ordinary, and popular meanings of the terms, as reflected in dictionary definitions, do not resolve the issue.

“Liable” merely means “legally obligated” (Webster’s New College Dictionary 631 (1999)) or “obligated according to law or equity” (Merriam-Webster’s Collegiate Dictionary 668 (2000)). Black’s Law Dictionary defines “liability” as the “quality or state of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment.” Black’s Law Dictionary 932 (8th ed. 2004). Neither of these definitions reveals how such a legal obligation attaches.

An “obligation” is a “legal or moral duty to do *** something” or a “formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing ***; esp. a duty arising by contract.” Black’s Law Dictionary 1104 (8th ed. 2004). Although it is beyond debate that a binding agreement can give rise to a legal obligation, such obligations can arise in other ways. A “statutory obligation,” for example, is an “obligation–whether to pay money, perform certain acts, or discharge duties–that is created by or arises out of a statute, rather than based on an independent contractual or legal relationship.” Black’s Law Dictionary 1105 (8th ed. 2004). Neither of these definitions mention the need for an adjudication or the filing of a lawsuit as a precondition of the obligation.

Similarly, the dictionary definition of “damages” as “[m]oney to be paid as compensation for injury or loss” does not reveal under what circumstances such compensation becomes due. Webster’s New College Dictionary 285 (1999); see also Merriam-Webster’s Collegiate Dictionary 290 (2000) (“compensation in money imposed by law for loss or injury”). The definition contained in the legal dictionary, “[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury” (
Black’s Law Dictionary 416 (8th ed. 2004)), suggests that funds expended are not damages unless paid in response to a claim or in compliance with an order. The filing of a lawsuit is, no doubt, sufficient to assert a claim for damages. The policies clearly contemplate that the insured might admit liability and agree to pay damages as part of a settlement or compromise of lawsuit. What is less clear is whether under the policy terms the filing of a lawsuit or, when an agency like the IEPA is involved, the initiation of administrative proceedings is necessary before funds expended to remedy property damage can be called damages.

We conclude that the policy language, standing alone, does not require the insured to have been served as the defendant or respondent in an adversarial proceeding before the duty to indemnify arises. If this were a dispute involving the construction of an insurance contract between a consumer and his insurer, we might stop at this point in the analysis and conclude that the language of the policy should be construed against the drafter because it is “obscure in meaning through indefiniteness of expression.” 
Platt
, 351 Ill. App. 3d at 330. However, both parties to these policies are sophisticated business entities that can be assumed to have specialized knowledge of the contractual terms they employ. Indeed, both parties cite to the substantial body of case law from Illinois and other jurisdictions interpreting similar policy language in similar factual situations. We now turn to those authorities to aid in our construction of the policies to determine whether the filing of a lawsuit or other adversarial action is a precondition to indemnification.

CLMI points to a decision of the Supreme Court of California, in which similar policy language was construed to require indemnification only of sums that the insured became legally obligated to pay as damages by order of a court. In 
Certain Underwriters at Lloyd’s of London v. Superior Court
, 24 Cal. 4th 945, 16 P.3d 94, 103 Cal. Rptr. 2d 672 (2001) (hereinafter 
Powerine
), the insured, an oil refiner, sought a declaration that its insurers were obligated to indemnify it for costs incurred in administrative proceedings concerning environmental claims. The issue on review was whether the insurer’s duty to indemnify for “all sums that the insured becomes legally obligated to pay as damages” was limited to money ordered by a court. 
Powerine
, 24 Cal. 4th at 955, 16 P.3d at 100, 103 Cal. Rptr. 2d at 678.

Although the policy language was quite similar to the policy language at issue in the present case, the policies themselves are vastly different. The policies purchased by Powerine were standard CGL policies that imposed on the insurer not only a duty to indemnify the insured for covered losses, but also a duty to defend the insured “in any suit seeking damages” for covered losses. 
Powerine
, 24 Cal. 4th at 957, 16 P.3d at 101, 103 Cal. Rptr. 2d at 680. These two “correlative” duties “lie at the core of the standard [CGL] policy.” 
Powerine
, 24 Cal. 4th at 958, 16 P.3d at 101, 103 Cal. Rptr. 2d at 680. The California court concluded that, under such a policy, “[w]here there is a duty to defend, there 
may be
 a duty to indemnify; but where there is no duty to defend, there 
cannot be
 a duty to indemnify.” (Emphases in original.) 
Powerine
, 24 Cal. 4th at 958, 16 P.3d at 102, 103 Cal. Rptr. 2d at 681.

We might agree with this conclusion if the policies at issue in the present case were standard CGL policies imposing both duties. However, CILCO purchased and CLMI sold excess liability coverage only. CLMI’s duty to indemnify cannot be predicated on the duty to defend because under no circumstances will these policies impose a duty to defend.

We do agree, however, with the California court’s remark that these two duties “differ in their triggering. Whereas the duty to indemnify can arise only after damages are fixed in their amount [citations], the duty to defend may arise as soon as damages are sought in some amount [citations].” 
Powerine
, 24 Cal. 4th at 958, 16 P.3d at 102, 103 Cal. Rptr. 2d at 680. The question for us is whether damages may be fixed in their amount, and the insured legally obligated to pay them, in the absence of a lawsuit or other adversarial proceeding.

CLMI argues further that even if the amounts paid by CILCO can be said to constitute “damages,” legal liability for damages “must be forged in the crucible of an adversary proceeding where third party claims and defenses thereto are tested.” CLMI argues that this court’s decision in 
Citizens Utility Board v. Illinois Commerce Comm’n
, 166 Ill. 2d 111 (1995), supports its reading of the policy term “damages” as requiring a lawsuit. In that case, however, we did not have occasion to use the term “damages.” The issue in 
Citizens Utility Board
 was whether the Commission had properly ruled that Illinois utilities, including CILCO, could recover the costs of coal tar cleanup at MGP sites through their utility rates. 
Citizens Utility Board
, 166 Ill. 2d at 121. In concluding that these costs could be passed on to ratepayers, we referred to the cleanup costs as “legally mandated costs of business” (
Citizens Utility Board
, 166 Ill. 2d at 122), and as “costs of doing business” (
Citizens Utility Board
, 166 Ill. 2d at 124). We analogized these costs to taxes, which are “a necessary expense of utility operations” (
Citizens Utility Board
, 166 Ill. 2d at 123), and “statutorily imposed operating expenses” (
Citizens Utility Board
, 166 Ill. 2d at 125).

CLMI also calls our attention to our statement that “[c]oal-tar cleanup costs may be likened to operating and maintenance costs incurred to repair land erosion or rotting building materials which are recoverable from ratepayers.” 
Citizens Utility Board
, 166 Ill. 2d at 128. This statement, however, is taken out of context. We did not state that statutorily mandated environmental cleanup is no different from routine maintenance of one’s property. Indeed, we noted that in some cases, state and federal environmental laws require utilities to clean up properties they no longer own. 
Citizens Utility Board
, 166 Ill. 2d at 129.

Citizens Utility Board 
was decided in an entirely different context–that of utility ratemaking under the Public Utilities Act (220 ILCS 5/1–101 
et seq
. (West 2002)). Our decision in 
Citizens Utility Board
 does not establish that the same expenses that are recoverable via utility rates cannot also be categorized as “damages” as that term is used in an insurance policy. Thus, nothing in 
Citizens Utility Board
 is relevant to the question at hand–whether the “damages” that must be indemnified under the terms of the insurance policies must be fixed by the resolution of a lawsuit, either by settlement or judgment.

CLMI also relies upon 
Outboard Marine
 to argue that the appellate court erred by analyzing the policy term “damages” separately from the terms “liable to pay,” “liability imposed *** by law,” and “obligated to pay.” Specifically, CLMI argues that the appellate court’s definition of damages as “ ‘ “money one must expend to remedy an injury for which he or she is responsible” ’ ” (342 Ill. App. 3d at 960, quoting 
Vogue Tyre & Rubber Co. v. CIGNA Property & Casualty Insurance Co.
, No. 96 C 4864, slip op. at ___ (N.D. Ill. November 13, 1998), quoting 
Outboard Marine
, 154 Ill. 2d at 116) was taken out of context. The “complete quote,” according to CLMI is: “ ‘damages’ connotes money one must expend to remedy an injury for which he or she is responsible, irrespective of whether that expenditure is compelled by a court of law in the form of compensatory damages or by a court of equity in the form of compliance with mandatory injunctions.” 
Outboard Marine
, 154 Ill. 2d at 116. Thus, CLMI asserts some sort of suit, either in law or in equity, is necessary.

In 
Outboard Marine
, the EPA and the IEPA had already brought separate actions against Outboard Marine before the insurance dispute arose. 
Outboard Marine
, 154 Ill. 2d at 98. The relief sought in the underlying litigation was equitable, rather than legal, in nature. 
Outboard Marine
, 154 Ill. 2d at 100. At issue was whether the insurers’ duty to defend under CGL policies was triggered by a suit for equitable relief when the policy language clearly required the existence of a suit seeking damages. The passage quoted above is contained in the portion of our 
Outboard Marine
 opinion in which we discuss the usual and ordinary meaning of the term “damages,” and in which we look to the dictionary definition for guidance. 
Outboard Marine
, 154 Ill. 2d at 115-16. Our inquiry in 
Outboard Marine
 was not how broad the usual and ordinary meaning of the policy term “damages” might be but, rather, whether it was so narrow that it excluded the expense of complying with a mandatory injunction. 
Outboard Marine
, 154 Ill. 2d at 115-16. What we learn from 
Outboard Marine 
is that, in the absence of policy language to the contrary, the language “suit seeking damages” will be construed to include suits seeking either or both compensatory damages and equitable relief. This lesson does not resolve the present dispute.

Because the policy at issue in 
Outboard Marine
 was a CGL policy, the “suit seeking damages” language was clearly intended to provide the trigger for the duty to defend. In the present case, no such trigger is needed because the parties did not contract for a duty to defend. The purpose and, therefore, the language of the CLMI policies are different from the CGL liability policies being construed in 
Outboard Marine
. The fact that the term “damages” in the 
Outboard Marine
 case was construed to include both legal and equitable remedies imposed by a final judgment does not necessarily mean that the same term, contained in a policy that does not expressly require a “suit,” does not refer to “the money required to be expended in order to right a wrong” (
Outboard Marine
, 154 Ill. 2d at 116) in the absence of a lawsuit.

We return, below, to a discussion of the meaning of the phrase “as damages” because further exploration of that term is necessary to determine whether funds expended pursuant to a legal obligation to remedy environmental pollution are damages, as opposed to some other form of payment. We can conclude without further analysis, however, that the language of the policies does not expressly require the insured’s liability for damages to be fixed by the resolution of a lawsuit, either by settlement or judgment. For example, the definition of “ultimate net loss” as “the sums for which the Insured is liable in settlement of an occurrence,” says nothing about the necessity for a suit to be filed before such a settlement can take place. The later definition of the same term, referring to the insured’s obligation to pay property damage claims “either through adjudication or compromise,” appears to permit the compromise of a claim without the necessity of an action having been filed against the insured. We note that in the liability insurance industry, when an insured admits liability for an injury, funds are routinely paid to injured parties in settlement of claims without the necessity for a lawsuit. The funds paid to resolve such claims are generally understood to be “damages” in the usual and ordinary sense of the word.

Having concluded that the policy language does not require the filing of a lawsuit or administrative complaint as a precondition to CLMI’s duty to indemnify, we now turn to the questions of whether CILCO was legally obligated to undertake cleanups of its MGP sites and, if so, whether the expenditures are properly characterized as damages.

2. A Legal Obligation to Pay

CLMI characterizes CILCO’s expenditures as purely voluntary and as motivated by its desire to be a good corporate steward of its land or to make a prudent investment in rehabilitating its property. Because CILCO’s actions were purely voluntary, CLMI argues, CILCO was not acting under a legal obligation.

CILCO’s legal obligation to make the cleanup expenditures, if any, did not attach as a result of a final judgment in a lawsuit or even of a ruling by a state administrative agency. Rather, CILCO was informed by the IEPA of the strict liability for coal tar contamination that attaches to those who formerly operated MGP sites. See 42 U.S.C. §9601 
et seq.
 (2000) (Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)); 415 ILCS 5/22.2(f) (West 2002) (imposing liability upon the owner or operator of a facility for the release or substantial threat of release of a hazardous substance, subject only to the defenses enumerated in subsection (j)); 415 ILCS 5/22.2(j) (West 2002) (an otherwise liable person shall not be liable for a “release or substantial threat of release of a hazardous substance” if the resulting damages were “caused 
solely
” (emphasis added) by one of the enumerated acts or events). CILCO, already aware of soil contamination at the MacArthur site and aware that it owned at least two other sites with buried coal tar containment structures that posed a threat of release of coal tar into the soil and groundwater, elected to participate in a voluntary cleanup program. The alternative, as described by the IEPA official, was to do it the “hard way” by ignoring the problem until the IEPA initiated an enforcement proceeding.

CLMI offers two decisions of this court and several decisions of the appellate court as support for its argument that CILCO was not acting under a legal obligation. We have already rejected reliance on 
Outboard Marine
 and 
Lapham-Hickey
 as a basis for construing the terms of the CLMI policies. These cases stand for the proposition that a pending legal proceeding is necessary to trigger an insurer’s duty to defend when a CGL policy expressly refers to the defense of suits seeking damages. 
Lapham-Hickey
, 166 Ill. 2d at 532; 
Outboard Marine
, 154 Ill. 2d at 116-17. The CLMI policies contemplate that an insured may become legally obligated to pay damages in the absence of a lawsuit. Thus, these cases do not assist us in determining under what circumstances such a legal obligation may arise.

In 
Northern Illinois Gas Co. v. Home Insurance Co.
, 334 Ill. App. 3d 38 (2002), the appellate court affirmed the circuit court’s ruling that the insurers owed no duty to indemnify the utility for expenses voluntarily incurred to investigate and clean up MGP sites. The operative policy language was almost identical to the CLMI policies at issue in the present case. 
Northern Illinois Gas Co.
, 334 Ill. App. 3d at 43. The Northern Illinois Gas Company (Nicor) participated in the IEPA voluntary site remediation program and thereafter sought indemnification from Home, claiming that it was legally obligated to pay the costs of investigation and cleanup “by reason of liability imposed by law or alternatively based upon its agreements with IEPA.” 
Northern Illinois Gas Co.
, 334 Ill. App. 3d at 43. The appellate court rejected this argument, finding 
Carus
 to be controlling because
 Carus
 relied not only on the “suit” language in the policy but on the “obligated to pay” language as well. 
Northern Illinois Gas Co.
, 334 Ill. App. 3d at 46.

The 
Carus
 court did indeed mention the “obligated to pay” language, but only in a single paragraph noting that Carus admitted that it “initiated its involvement in the program voluntarily by petitioning the IEPA.” 
Carus
, 293 Ill. App. 3d at 910. CILCO also participated in the voluntary program, but only after being informed by the IEPA that its compliance would be forthcoming, one way or the other. Further, Carus did not seek a declaration that Home was liable for the costs of the cleanup of the contaminated property. 
Carus
, 293 Ill. App. 3d at 910. Carus was seeking indemnification of only the costs of “hiring consultants and voluntarily conducting its own investigation.” 
Carus
, 293 Ill. App. 3d at 910. Thus, the 
Carus
 court never considered whether Carus had been subject to a claim for damages or was legally obligated to pay the cleanup costs.

We find the two other appellate court cases offered by CLMI, which were also cited with approval in 
Northern Illinois Gas Co.
, to be inapposite. In 
Douglas v. Allied American Insurance
, 312 Ill. App. 3d 535 (2000), the insurer initially provided representation pursuant to its duty to defend but then tendered the policy limits to the court and withdrew, without reaching a settlement or obtaining the insured’s consent. The insurer relied upon the policy term stating that it had no obligation to the insured after the policy limits were “exhausted by payment.” 
Douglas
, 312 Ill. App. 3d at 539. The appellate court determined that, when read together with the preceding language, which included the term “legally obligated to pay,” the entire provision was revealed to be ambiguous. 
Douglas
, 312 Ill. App. 3d at 540. The appellate court observed:

“The term ‘legally obligated’ is not defined in the policy, but its plain meaning suggests an obligation due to judgment or settlement. In support of our interpretation, we note that Black’s Law Dictionary states that a legal obligation forms the basis for a judgment in a court of competent jurisdiction.”
 Douglas
, 312 Ill. App. 3d at 540.

The court cited to the fifth edition (1979) of Black’s Law Dictionary, which is not readily available. In the sixth edition (1990), however, the term “legal obligation” is defined as “an obligation which would form [the] basis of judgment against [the] state in [a] court of competent jurisdiction should [the] Legislature permit [the] state to be sued.” Black’s Law Dictionary 896 (6th ed. 1990). Thus, given the selective nature of the quotation, we find this passage from 
Douglas
 to be less than persuasive. In any event, if a legal obligation “forms the basis” for a judgment, it must be capable of existing independently of the judgment itself. We note that the most recent edition of the dictionary does not contain an entry for “legal obligation,” perhaps because the term is so vague and potentially encompasses so much. Finally, if 
Douglas
 offers any guidance at all in the present case, it suggests that we should find the CLMI policies ambiguous.

In 
Guillen v. Potomac Insurance Co. of Illinois
, 323 Ill. App. 3d 121, 131 (2001), one issue was whether the insurer was “legally obligated to pay” an amount settled upon by the insureds and the plaintiff after the insurer failed to defend a lawsuit. 
Guillen
 does not, however, assist us in answering the issue presented in the instant case–under what circumstances a legal obligation to pay can arise in the absence of an adversarial proceeding.

The appellate court in the present case offered four reasons for its conclusion that CILCO was legally obligated to remediate the contamination at its MGP sites. 342 Ill. App. 3d at 954-55. First, CERCLA and the Act mandate such a cleanup. Indeed, the Act imposes strict liability for this type of contamination. 415 ILCS 5/22.2(f) (West 2002). Second, 
Outboard Marine 
and 
Lapham-Hickey 
do not stand for the rule urged by the insurers. Third, 
Carus
 and 
Northern Illinois Gas Co.
 are not persuasive on this issue. And, finally, construing the term “legally obligated” in the manner CILCO urges is supported by authority from the United States District Court from the Northern District of Illinois, as well as the courts of several other states.

We have already distinguished 
Outboard Marine
, 
Lapham-Hickey, Carus
 and 
Northern Illinois Gas Co
. As to the first reason, CLMI responds that even strict liability is not absolute and that environmental statutes are not self-executing. The absence of a lawsuit in the present case means that there was no opportunity to raise any defenses or limitations to liability. CILCO, however, admitted liability. Indeed, because the only defense that an owner or operator of a contaminated MGP site might conceivably raise is that the contamination was the sole responsibility of another party (415 ILCS 5/22.2(j)(1)(C) (West 2002)), it would have been futile for CILCO to contest liability. Further, CLMI had no duty to defend CILCO and could not have raised defenses on CILCO’s behalf in any event.

With regard to the appellate court’s final rationale, CLMI argues that the appellate court’s reliance on 
Vogue Tyre & Rubber Co. v. CIGNA
, No. 96 C 4864 (N.D. Ill. November 13, 1998), 
reconsideration granted and summary judgment denied
, No. 96 C 4864 (N.D. Ill. February 11, 1999), is misplaced because 
Vogue Tyre 
is contrary to Illinois law and is factually distinguishable from the present case. It follows that CLMI also argues that the out-of-state cases that are consistent with 
Vogue Tyre 
should be rejected.

In 
Vogue Tyre
, the insured sought indemnification for expenses it incurred remediating environmental contamination caused by leaking underground storage tanks. The insurer moved for summary judgment on the basis that it had no duty to defend or to indemnify because no suit had been filed. The district court determined that the proper inquiry, given the language of the policy, was not whether there was a lawsuit but, rather, whether the insured faced legal liability. The policies at issue stated that CIGNA would indemnify Vogue Tyre for all sums it became “legally obligated to pay as damages because of bodily injury or property damage.” The district court initially granted summary judgment to the insurer because Vogue Tyre had cleaned up the site “on its own accord.” Although the district court acknowledged that Vogue Tyre would have been legally obligated under the Act (415 ILCS 5/22.2(f) (West 2002)) to pay cleanup costs if a government agency had cleaned up the site, it was not legally obligated to clean up the site merely because it received a letter from the IEPA that “only recommended measures to address” soil contamination. Thus, the district court concluded that because Vogue Tyre was not legally obligated to perform the cleanup operations, CIGNA did not have to reimburse Vogue Tyre under the terms of the policy.

The district court subsequently granted reconsideration to address Vogue Tyre’s argument that state and federal environmental statutes clearly required it to remediate the site. Vogue Tyre argued that no third party need be involved if environmental regulations mandate the cleanup. The district court found that under Illinois law, mandatory environmental regulations do impose a legal obligation without a requirement of third-party action. Thus, Vogue Tyre was legally obligated to remediate the site, not only in the absence of a lawsuit, but in the absence of any action by the IEPA or other party triggering a claim for damages.

The appellate court was persuaded by the reasoning of 
Vogue Tyre
. 342 Ill. App. 3d at 959. Finding that CILCO was legally obligated under state and federal law to comply with mandatory environmental regulations that impose strict liability for this type of environmental harm, the appellate court concluded that it is irrelevant that CILCO participated in a voluntary program rather than wait for an enforcement action to be filed. 342 Ill. App. 3d at 959.

CLMI argues that 
Vogue Tyre 
is contrary to Illinois law and is factually distinguishable from the present case. The factual distinction urged is that the insurer in 
Vogue Tyre
 did not contest that environmental regulations required the insured to remediate the site and CLMI “most assuredly” contests whether CILCO was required to remediate its sites. We do not find this to be a meaningful factual distinction. The Act is clear that CILCO is strictly liable for the contamination at its MGP sites. Thus, the Act most assuredly requires CILCO to remediate. CLMI can, however, dispute whether CILCO’s fulfillment of its legal obligation under the Act resulted in the payment of damages. Before turning to the question of how the “damages” policy term impacts the “obligated to pay” provision, we examine the cases from other jurisdictions that the appellate court relied upon and that CLMI attempts to distinguish.

In 
Bausch & Lomb Inc. v. Utica Mutual Insurance Co.
, 330 Md. 758, 625 A.2d 1021 (1993), the insured plaintiff (B&L) undertook an environmental cleanup at an industrial site, without any legal proceedings having been formally filed against it by a third party and without a written administrative directive from the state enforcement agency. 
Bausch & Lomb
, 330 Md. at 764, 625 A.2d at 1024. The CGL policy sold to B&L by the defendant insurer contained a provision requiring indemnification of sums that the insured became “legally obligated to pay as damages because of ... property damage.” The policy did not define the term “damages.” Nor did it define the word “suit,” which appeared in the policy provision regarding the insurer’s duty to defend. 
Bausch & Lomb
, 330 Md. at 765, 625 A.2d at 1024. Although the state did not file an administrative proceeding against B&L, it did list the contaminated facility on a published master list of potentially hazardous sites and conduct a preliminary investigation. 
Bausch & Lomb
, 330 Md. at 768-69, 625 A.2d at 1026. A state environmental official testified that “the property owner did not enjoy the option of doing nothing” at this stage. “[A]ny testing and clean-up necessary to comply with environmental laws and regulations would be done either by the owner, acting voluntarily or under an injunction, or by the appropriate government agency at the owner’s expense.” 
Bausch & Lomb
, 330 Md. at 770, 625 A.2d at 1027. The opinion does not reveal how or whether this threat of enforcement by litigation was communicated to B&L. B&L fully complied with the state agency to clean up the facility. 
Bausch & Lomb
, 330 Md. at 769, 625 A.2d at 1026-27.

The court concluded that the cleanup costs were damages that B&L had been legally obligated to pay. The relevant environmental statutes imposed strict liability upon the owners of polluted properties. 
Bausch & Lomb
, 330 Md. at 779-80, 625 A.2d at 1031-32. The state had the authority to enforce the laws by administrative order, injunction, or direct remediation at the owner’s expense. Thus, the “tacit threat of formal State intervention was always present in B&L’s dealings with the State regulators.” 
Bausch & Lomb
, 330 Md. at 780, 625 A.2d at 1032. Ultimately, no matter what course was taken, B&L “faced the task of complying with the environmental laws, and paying the costs of compliance.” 
Bausch & Lomb
, 330 Md. at 780, 625 A.2d at 1032. The court concluded that the trial court had properly found that B&L’s “response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay.” 
Bausch & Lomb
, 330 Md. at 780, 625 A.2d at 1032.

On the question of whether these amounts were paid “as damages,” the Maryland court relied on dictionary definitions, which did not entirely resolve the question, but did comport with the trial court’s observation that the term means “anything that a third party can make you pay for because of damage to that third party’s property.” 
Bausch & Lomb
, 330 Md. at 781, 625 A.2d at 1032. Rejecting an overly technical definition of the term that would have “cut nice distinctions” (as between legal and equitable remedies, for example), the court noted that the “ordinary person understands ‘damages’ as meaning money paid to make good an insured loss.” This definition would include environmental response costs. 
Bausch & Lomb
, 330 Md. at 782, 625 A.2d at 1033. The court also noted that such a broad definition of “damages” would still distinguish between other compelled expenditures such as fines, penalties, or assessments, which would not be included. 
Bausch & Lomb
, 330 Md. at 782, 625 A.2d at 1033.

CLMI would distinguish 
Bausch & Lomb
 from the present case on the basis that B&L operated under the tacit threat of state intervention, while CILCO undertook its cleanup efforts entirely voluntarily. See also 
Northern Illinois Gas Co.
, 334 Ill. App. 3d at 49-50 (finding no tacit threat of agency action and, further, that such a threat does not amount to liability imposed by law).

The factual record, which CLMI has accepted as true for purposes of its motion for summary judgment (see 
Harrison v. Hardin County Community Unit School District No. 1
, 197 Ill. 2d 466, 476 (2001) (Harrison, C.J., specially concurring, joined by Kilbride, J.) (facts contained in an affidavit in support of a motion for summary judgment that are not contradicted by counteraffidavit are admitted and must be taken as true for purposes of the motion)), reveals that the IEPA informed CILCO and other utilities at a meeting in 1987 that they could clean up their MGP sites “the easy way or the hard way.” This is a tacit threat of state intervention. More importantly, this assertion of a legal obligation by a state agency, addressed to the owners of MGP sites, is similar in nature to the demand for compensation that typically precedes litigation. We find 
Bausch & Lomb 
highly persuasive and not readily distinguishable on the facts.

In 
Weyerhaeuser Co. v. Aetna Casualty & Surety Co.
, 123 Wash. 2d 891, 874 P.2d 142 (1994), the insured filed a declaratory judgment action against its CGL insurers seeking a declaration of coverage for the cleanup expenses at dozens of polluted sites. 
Weyerhaeuser
, 123 Wash. 2d at 893, 874 P.2d at 144. The policies, which had been written over a 34-year period, provided coverage for all sums that the insured was obligated to pay, by reason of the liability imposed by law for damages to property.
 Weyerhaeuser
, 123 Wash. 2d at 896-97, 874 P.2d at 145. The issue was whether the policies provided coverage for actions taken by Weyerhaeuser to clean up polluted sites pursuant to statute, when the state environmental agency had made no overt threat of formal legal action. 
Weyerhaeuser
, 123 Wash. 2d at 896, 874 P.2d at 145. The relevant statute imposed strict liability on current owners of contaminated facilities. 
Weyerhaeuser
, 123 Wash. 2d at 897-98, 874 P.2d at 146. Rejecting the insurers’ argument that there must be an adversarial proceeding, or at least the threat of such a proceeding, before coverage exists, the Washington court concluded that nothing in the language of the insurance policy requires a “claim” or an overt threat of action before the insured becomes legally obligated to comply with the mandatory provisions of the environmental statute. 
Weyerhaeuser
, 123 Wash. 2d at 913, 874 P.2d at 154. Characterizing this argument as an attempt to add to the language of the policies, the court noted that if the insurers intended to provide coverage only if there were a lawsuit, or the threat of a lawsuit, they could have written policy language to reach that result. 
Weyerhaeuser
, 123 Wash. 2d at 913, 874 P.2d at 154.

We agree with CLMI that the court in 
Weyerhaeuser
 defined damages more broadly than is justified by the language of the policies. The term “damages” connotes the existence of another party who is asserting a claim. We concluded, above, that under the language of the CLMI policies, the claim need not take the form of a lawsuit or administrative proceeding. However, at the very least, an insured who seeks indemnification on the basis that it acted under a legal obligation imposed by a strict liability statute must have acted in response to an assertion by a potential plaintiff (in this case, the IEPA) that it must act or face the consequences. A purely unilateral effort by an insured to clean up contaminated property may fulfill a statutorily mandated legal obligation, but the expenditures made do not constitute damages.

Finally, in 
Metex Corp. v. Federal Insurance Co.
, 290 N.J. Super. 95, 675 A.2d 220 (1996), a New Jersey court held that the insured was legally obligated to pay for the cleanup of a spill on the basis of a state statute that imposed strict liability, without regard to whether a lawsuit had been filed or an agency directive had been issued. The court distinguished between “claims-made” policies in which coverage is triggered by a claim made by a third party and “occurrence” policies in which coverage is premised on the happening of an occurrence. 
Metex
, 290 N.J. Super. at 103-04, 675 A.2d at 224. Occurrence policies have no third-party claim requirement. 
Metex
, 290 N.J. Super. at 104, 675 A.2d at 224. In the end, the New Jersey court concluded that it is the “statutory mandate that makes a polluter legally obligated to pay damages because of property damage. This liability arises upon the discharge of a hazardous substance onto the property.” 
Metex
, 290 N.J. Super. at 104, 675 A.2d at 225.

The 
Metex
 court’s observation about the difference between occurrence-based policies and claims-based policies and the need for the “trigger” of a third-party claim is not entirely accurate. Under both types of policies, it is the making of a claim that triggers the insurer’s duty to indemnify. 
An occurrence policy is an “agreement to indemnify for any loss from an event that occurs within the policy period, regardless of when the claim is made.” Black’s Law Dictionary 822 (8th ed. 2004). In contrast, a claims-made policy is an “agreement to indemnify against all claims made during a specified period, regardless of when the incidents that gave rise to the claims occurred.” Black’s Law Dictionary 821 (8th ed. 2004).

The language in the CLMI policies clearly contemplates occurrence-based claims. For example, in the 1957-71 policies, CLMI agreed to indemnify CILCO for sums that CILCO became liable to pay as damages “by reason of an occurrence” resulting from the insured’s ownership or use of property. The later policies referred to liability imposed by law for damages for property damage “caused by or arising out of each occurrence.” The definition of “ultimate net loss” in the earlier policies referred to sums for which the insured “is liable in settlement of an occurrence.”

We agree with the reasoning of 
Vogue Tyre
 and the appellate court that mandatory environmental regulations that impose strict liability on any owner or operator who cannot prove that another entity is “solely” responsible for the contamination (415 ILCS 5/22/2(j) (West 2000)) impose a legal obligation of compliance. However, we also agree with CLMI that insureds ought not be able to act entirely unilaterally to undertake environmental cleanup and then to obtain indemnification on the basis that they were legally obligated to do so. If no third party asserts a right to the damages, the payment is merely gratuitous.

We conclude, therefore, that the mere existence of such regulations and the insured’s decision to voluntarily undertake environmental cleanup is not sufficient to invoke the insurer’s duty to indemnify. At a minimum, the insured must be acting in response to a claim. That is, if a lawsuit or administrative action has not been initiated, there must have been at least the assertion of a claim.

In sum, the requirement of a claim as a precondition of a legal obligation to pay damages provides the necessary link between the damages inquiry, which looks at the nature of the expenditure for which the insured is seeking indemnification, and the legal obligation inquiry, which looks at the source of the obligation to pay. By making a claim, the allegedly injured party (in this case the people of the State of Illinois through the IEPA) asserts that the other party is legally obligated to provide a remedy, in the form of damages, for the alleged injury. Such a claim need not necessarily be in the form of a demand letter, particularly when the legal obligation being asserted is based on a strict liability statute. See Black’s Law Dictionary 463 (8th ed. 2004) (a “demand letter” is a “letter by which one party explains its legal position in a dispute and requests that the recipient take some action *** or else risk being sued”).

In the present case, the affidavit of Steven L. Burns reveals that CILCO was confronted with a claim in the form of an assertion by the IEPA that the agency intended to enforce the strict liability provision against owners or operators of former MGP sites. CILCO was aware that it owned three such sites, one of which was already leaking into the surrounding soil and the others presenting the threat of leakage. The IEPA official tacitly threatened litigation by making the “easy way or the hard way” remark. This is sufficient to satisfy the requirement of a claim at this stage of the proceedings. That is, for purposes of its motion for summary judgment, CLMI has asserted that there is no substantial question of material fact. 
Outboard Marine
, 154 Ill. 2d at 102. We find that the facts asserted in the affidavit regarding the substance of the meeting are sufficient to satisfy the requirement of a claim.

We, therefore, hold that under the facts as alleged, CILCO was operating under a legal obligation when it agreed to participate in the voluntary cleanup program. If the funds expended can properly be characterized as damages, CLMI must indemnify CILCO.

3. Construing the Term “As Damages”

As noted above, CLMI argues that the appellate court erred by construing the term “damages” apart from the terms referring to a legal obligation to pay. Having concluded thus far that the requirement of a claim provides the necessary link between these two concepts, we consider whether the costs incurred by CILCO for a statutorily mandated environmental cleanup in response to IEPA’s claim may be considered “damages,” as opposed to some other form of expenditure.

CLMI accurately points out that business entities are legally obligated to make all sorts of payments and that the mere fact that these payments are made pursuant to a legal obligation does not mean that they are paid “as damages.”

We agree. One may be legally obligated to pay taxes, to pay fines or penalties, or to pay debts. Damages are distinguished from other sorts of payments by their remedial purpose. The language of the Act makes the remedial purpose of the cleanup expenditures clear. It imposes liability for “all costs of removal or remedial action” (415 ILCS 5/22.2(f) (West 2002)), and refers to the “costs and damages” provided for in this section (415 ILCS 5/22.2(i) (West 2002)).

The policy language, which limits indemnification to “damages on account of” bodily injury or property damage, defines what specific types of damages CLMI must indemnify. Not all damages that CILCO may become legally obligated to pay are covered by the policy.

We conclude that these expenditures were made in response to a claim of strict liability, asserted by the IEPA against CILCO, and that they were made for a remedial purpose. As such, they constitute damages within the plain meaning of the policies.

4. Public Policy

Both CLMI and CILCO urge this court to take public policy concerns into account in construing the language of the CLMI policies. The relevant public policies include giving effect to commercial expectations, on the one hand, and, on the other, encouraging polluters to take swift remedial action upon becoming aware of environmental contamination and discouraging them from inviting a lawsuit for the sole purpose of obtaining indemnification from their insurers.

However, the question presented in this case, while complex, is merely one of construction of the language of an insurance policy. The terms of the policies are either plain in their meaning, in which case they will be given effect unless they violate public policy, or else they are ambiguous and may be construed against the drafter. We are not permitted to rewrite the language of the policies agreed upon by the parties simply to suit our idea of desirable social goals.

We have concluded that when the type of property damage falls within the scope of the policy, a claim for damages is made by a potential plaintiff, and the insured is legally obligated by virtue of a strict liability statute to provide a remedy, the language employed in the CLMI policies requires indemnification. Any effect of this holding on CLMI or the insurance industry as a whole can be remedied by the drafting of more specific policy language. Any effect on the incentives that exist for polluters to act promptly upon learning of environmental contamination can be addressed by the legislature.

CONCLUSION

We agree with the appellate court that the circuit court erred in granting summary judgment to CLMI on the issue of indemnification. Based on the record at this stage of the proceedings, the expenditures made by CILCO are “damages” as that term is used in the CLMI contracts because they were paid in response to a IEPA claim for the purpose of remedying damage to property. We further hold that CILCO was legally obligated to make these expenditures because the Act imposes strict liability for the claimed harm and because it would have been futile for CILCO to deny its liability. We express no opinion on the reasonableness of the expenditures.

The judgment of the appellate court, reversing the circuit court and remanding for further proceedings, is affirmed.

Appellate court judgment affirmed.

JUSTICE KILBRIDE took no part in the consideration or decision of this case.