FIFTH DIVISION
August 17, 2007

No. 1-05-1656

| | | |
|---|---|---|
| BRENDAN REGAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| MUTUAL OF OMAHA INSURANCE COMPANY, | ) | Honorable |
| | ) | Peter Flynn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff Brendan Regan brought this action against defendant Mutual of Omaha Insurance Company seeking a declaratory judgment that personal injuries he sustained while on a student baseball trip to Florida were covered by a policy issued by defendant. Plaintiff and defendant each filed a motion for summary judgment. The trial court entered an order granting plaintiff's motion for summary judgment and an order denying defendant's motion for summary judgment. Defendant now appeals those two orders. We affirm.

BACKGROUND

The pleadings, motions, and attached exhibits establish the following facts. In March 2002, plaintiff, a student at St. Ambrose University in Davenport, Iowa, and a member of the St. Ambrose baseball team, went to Florida with the team to participate in a baseball tournament

called the Homestead Challenge. On March 13, 2002, the team's only scheduled "day off" during the tournament, plaintiff sustained a spinal cord injury when he dove into a wave and struck the ocean floor at a beach adjacent to the hotel where the team was staying.

At the time of the accident, St. Ambrose was a member of the National Association of Intercollegiate Athletics (NAIA). As a member, St. Ambrose was required by the NAIA bylaws to be enrolled in the NAIA catastrophic athletic injury insurance program under a policy issued by defendant.

The policy states in part that defendant will insure student athletes in all sanctioned and officially recognized intercollegiate sports (Class I) and pay benefits as follows:

"Coverage is provided for participation in scheduled games, supervised practice sessions and during authorized group or team travel that is paid for or reimbursed by the Sponsoring Organization in connection with such games or practice sessions."

The policy defines "covered travel" as follows:

" 'Covered Travel' means team or group travel by participants in a Covered Event:

(a)     directly to or from a Covered Event;

(b)     authorized and paid for or reimbursed by the Sponsoring Organization; and

(c)     supervised by staff members or a designated representative of the Sponsoring

1-05-1656

Organization.

Covered Travel begins with departing from the meeting place for

such travel and ends upon the release of the Insured from the

Sponsoring Organization's supervision."

The trip to Florida for the baseball tournament was authorized by St. Ambrose and paid for with money from the university athletic department fund and team fundraising activities. Each player on the team was required to pay for the cost of his airfare, hotel, and food during the trip. Plaintiff testified in his deposition that in order to raise money to cover these costs, he and his teammates sought and received pledges from sponsors based upon the number of miles they ran during conditioning. The money raised by the players in turn went into a fund which Coach James Callahan controlled and used to pay for the team's airfare as well as hotel and meal expenses during the trip. St. Ambrose paid for the players' transportation to and from Midway airport in Chicago and the airport in Miami as well as to and from baseball games scheduled during the tournament in Florida. The university also paid the cost of entering the tournament.

On March 9, 2002, the St. Ambrose baseball team, Coach Callahan, and three assistant coaches met at St. Ambrose's indoor sports arena and boarded a bus that took them to Midway Airport in Chicago. The team and coaches then flew to Miami; upon their arrival, they were taken in vans to the Comfort Inn Hotel in Miami Beach. Coach Callahan chose the Comfort Inn because it was affordable and in a safe area. The St. Ambrose baseball team was scheduled to play at the Homestead Challenge in Homestead, Florida, on March 10, 11, 12, and 14-17 of 2002. No baseball games or practice sessions were scheduled for March 13, 2002, which was the team's

3

"day off" from the tournament.

Coach Callahan testified in his deposition regarding rules that members of the team were required to follow while in Miami. Those rules provided, inter alia, that players were to go everywhere as a group. If a player wanted to go anywhere on his own, he had to have a "buddy"; even with a buddy, players had to first receive permission from one of the coaches before leaving the group. Players were prohibited from consuming alcohol less than 48 hours before any scheduled game and were prohibited from having overnight guests in their hotel rooms. If a player failed to follow these rules, he would be subject to discipline by the coaches. These rules were in effect throughout the trip, during the rest day as well as game days.

Upon arriving at the Comfort Inn, the players went to the rooms to which they had been assigned by Assistant Coach Tony Huntley. The coaches prohibited the players from ordering room service, and the telephones in the players' rooms were shut off to long distance service. The players were subject to a bed check each evening at 10 p.m., at which time they were to be in their rooms with their lights out and attempting to sleep.

According to Coach Callahan, on the team's day off, plaintiff and his teammates were "pretty much left to their own devices." Players were free to pursue individual recreational activities in south Florida with each other, their parents, friends, and girlfriends. Coach Callahan stated that on the team's day off, he went to a nearby barber shop for a haircut. Assistant Coach Tony Huntley left Miami Beach and went to the Minnesota Twins' training facility in Fort Myers.

Plaintiff testified in his deposition regarding rules that he and his teammates were required to follow. Plaintiff explained that they were allowed to walk in the area around the hotel,

including out onto the beach, without having to report to anybody. According to plaintiff, he and his teammates "were basically told that if [they] were going to leave or go somewhere outside of the hotel or after a game, that [they] were supposed to tell the coaches." There were random bed checks during the players' stay at the Comfort Inn, and if they failed to tell coaches where they were going or got caught doing something they were not supposed to do, they would probably not get to play.

Shortly before noon on March 13, 2002, the team's day off, plaintiff left his hotel room and walked with his teammate Cain Reason to the beach adjacent to the Comfort Inn. Plaintiff stated that there were a swimming pool and fence behind the hotel and explained that in order to get to the beach area, it was necessary to exit a gate attached to that fence and walk over a hill or rough area which resembled a little pier. There was not a lifeguard on duty, and no member of the St. Ambrose coaching staff was present at the beach. Plaintiff did not advise and was not required to advise any of the coaches that he was going to that beach because it was immediately adjacent to the hotel.

After arriving at the beach, plaintiff ran into the ocean, dove headfirst into a wave, and hit his head on a concealed sandbar. Teammates on the beach pulled plaintiff from the water; as a result of the diving accident, plaintiff sustained a paralyzing spinal cord injury.

After plaintiff was injured, a claim was made on his behalf under the policy at issue in this case. Defendant denied the claim based on its conclusion that "the injury occurred during an off day and the injury did not occur during a scheduled game or supervised practice session nor travel directly [*sic*] or from a scheduled game or supervised practice session."

5

Thereafter, plaintiff filed the instant declaratory judgment action, seeking a finding that he was a covered insured under the policy issued by defendant and thus entitled to receive all the benefits available to him under that policy. Plaintiff and defendant each filed a motion for summary judgment. In its motion for summary judgment, defendant contended that "[b]ecause [plaintiff's] injury occurred while swimming on his own personal free time, his activities fall outside the Covered Activities and Events" described in the policy. In his motion for summary judgment, plaintiff contended that the entire trip, from the time that the players departed from St. Ambrose's indoor sports arena until they returned to the St. Ambrose campus, was "one single incident of travel during the extent of which the policy was in full force and effect."

Following a hearing on the motions, the trial court entered an order granting plaintiff's motion for summary judgment and denying defendant's motion for summary judgment. In support of its ruling, the court focused on the portion of the policy's definition of covered travel which states "[c]overed travel begins with departing from the meeting place for such travel and ends upon the release of the Insured from the Sponsoring Organization's supervision." Specifically, the court observed:

> "Both sides here have acknowledged that that sentence cannot fairly be construed to mean that anything an insured does during the course of covered travel is - or anything the student does during the course of covered travel is automatically insured even if what the student does is completely outside the normal realm of the travel. That is why during the discussion, particularly with Mr. Smith, I invoked the concept of frolic and detour because I think that has a very close resemblance to the kind of analysis that we have to undertake here.

6

The reason this case is difficult is that what Mr. Regan was doing at the time he was injured was not a frolic and detour in the sense that it was unauthorized or wrong, which is where you usually see frolic and detour applying in master and certain liability cases. But it was arguably a frolic and detour because it was an unplanned event which was not part of the planned events on the trip. It was not something the coaches or the school told him to do nor was it something they had forbidden him to do. It was simply something that was to one side, outside the regular stream of the travel to and from the event and the event itself.

It is a difficult question whether conduct of that type, conduct which is not wrongful, which is not affirmatively unauthorized in the sense that it's forbidden which is consistent with the general guidelines to which the student was subject which nevertheless is entirely voluntary on the part of the student, it's a difficult question whether conduct of that kind ought to be covered under the policy.

I think the wording of the policy when you take all three of the provisions that I read together, particularly the provision having to do with covered travel and when it begins and ends, must in this instance be read to include what happened to Mr. Regan because he was not deviating from the requirements of his supervision. I say that because it seems clear and the depositions of the coaches strongly suggest that from the school's standpoint, as from the parents' standpoint, the schools considered the student to be subject to the school's supervision from the time the trip begins until the trip ends. If the student deviates from the

7

requirements [of] that supervision, then the student is absolutely on his or her own and whatever happens is I think uninsured. I don't think there's any question about that.

But if the student doesn't deviate, then it seems to me that a reasonable person would read the policy to say that so long as the student is playing by the rules, the insurance coverage ought to apply. That result is not altogether free from doubt. But applying the rule that an ambiguity must be construed in favor of the insured, it seems to me that that is the response which is called for here.

So I will grant the plaintiff's motion for summary judgment and deny the defendant's motion for summary judgment."

ANALYSIS

We review de novo the trial court's orders granting plaintiff's motion for summary judgment and denying defendant's motion for summary judgment. Central Illinois Light Co. v. Home Insurance Co., 213 Ill. 2d 141, 153 (2004). The construction of an insurance policy is a question of law, which is also subject to de novo review. Central Illinois, 213 Ill. 2d at 153.

"When construing the language of an insurance policy, a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy." Central Illinois, 213 Ill. 2d at 153. "An insurance policy, like any contract, is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." Central Illinois, 213 Ill. 2d at 153. "If the words used in the policy are clear and unambiguous, they must be given their plain, ordinary, and popular meaning." Central Illinois, 213 Ill. 2d at 153. "However, if the words used in the policy

8

are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter." Central Illinois, 213 Ill. 2d at 153.

Defendant contends on appeal that plaintiff is not covered under the subject policy because his injury occurred while participating in unsupervised recreational activities and not during "covered travel." Defendant correctly notes that in order to obtain coverage in the instant case, plaintiff was required to establish his injury occurred during "covered travel."

As previously noted, the policy defines "covered travel" as follows:

" 'Covered Travel' means team or group travel by participants in a

Covered Event:

(a)    directly to or from a Covered Event;

(b)    authorized and paid for or reimbursed by the

Sponsoring Organization; and

(c)    supervised by staff members or a designated

representative of the Sponsoring

Organization.

Covered Travel begins with departing from the meeting place for

such travel and ends upon the release of the Insured from the

Sponsoring Organization's supervision."

Defendant asserts that the requirements included in subsections (a), (b), and (c) of the above definition have not been satisfied. Defendant first contends, pursuant to subsection (a), that plaintiff "was not injured during travel *directly to or from* a scheduled baseball game or supervised practice session" and thus failed to meet the first prong of the above definition. (Emphasis in

9

original.)  To support this contention, defendant cites dictionary definitions which define "directly" as "[i]n a direct way without anything intervening" and "[in] a direct line, way, or manner; straight."  Relying upon these definitions, defendant construes "covered travel" to refer to "the process of moving directly (without deviation) to or from the location of an intercollegiate game or team practice session."  Based upon this construction, defendant contends that at the time of his injury, plaintiff "was not engaged in team travel *directly to or from* a scheduled game or supervised practice session," but rather "was injured, independent of team travel, while diving into the ocean on a day when no baseball games or team practice sessions were scheduled." (Emphasis in original.)

We recognize that plaintiff was not physically moving or being transported directly to or from a game or practice session at the time he was injured.  We note, however, that the policy provision in question does not state "covered travel" means team or group *transportation* directly to or from a covered event.  Rather, that provision defines "covered travel" in part as team or group *travel* directly to or from a covered event.  As plaintiff points out in his brief, in today's world travel is not simply limited to transportation, but also entails being away from home for a period of time and includes meals and lodging as well activities incident thereto.  Indeed, we agree with plaintiff's assertion that his stay at the hotel and his use of the hotel facilities and beach "[were] all part and parcel of his travel directly to the remainder of the games on the Florida trip and [were] in no way a detour or diversion from his destination - the remaining locations in Florida for the rest of the travel schedule."  Accordingly, we conclude there is no genuine issue of material fact that plaintiff was engaged in team or group travel directly to or from a covered event at the time of his injury.

Defendant next contends that because St. Ambrose did not pay or reimburse plaintiff for his airfare, lodging, meal, and entertainment expenses, the second prong of the definition of covered travel, which requires that the travel be "paid for or reimbursed by" St. Ambrose, was not satisfied.

The provision in question states that " 'Covered Travel' means team or group travel by participants in a Covered Event *** (b) authorized and paid for or reimbursed by the Sponsoring Organization." We find that there is no genuine issue of material fact that St. Ambrose paid for the team or group travel. We recognize that plaintiff and his teammates were responsible for raising funds sufficient to cover the cost of their airfare, hotel, and food. However, the players did not keep the money necessary to pay for airfare, hotel, and food but, rather, turned that money over to Coach Callahan, who in turn secured group rates for the team at the hotel and the airline. Furthermore, the university paid the entry fee for the tournament and the cost of transporting the players to and from baseball games scheduled during the tournament. In addition, the university paid the cost of transporting the team to and from Midway airport in Chicago and the cost of transporting the team to and from the Miami airport. In light of these facts and circumstances, we conclude there is no genuine issue of material fact that the team's travel was paid for by St. Ambrose.

Defendant asserts in his reply brief that "some of the students paid for their spring trip with their personal savings or with money obtained from their parents." The portion of Coach Callahan's deposition cited by defendant in support of this proposition does not reflect that plaintiff or his teammates paid for their trip to Florida with personal savings or with their parents' money. Rather, Coach Callahan simply stated in his deposition that parents have on occasion

11

helped players pay for baseball trips and explained that it is only in very rare cases that players do not raise the requisite amount.

Defendant next contends that "[plaintiff's] swimming and diving activities were not supervised by St. Ambrose" and thus did not satisfy the policy's requirement that "covered travel" be "supervised by staff members or a designated representative." Defendant argues that "[b]ecause [plaintiff] was free to pursue recreational activities of his choosing on the team's day off, and because [his] swimming and diving activities on that day, in fact, were not conducted in the presence or under the supervision of St. Ambrose's coaching staff, [plaintiff's] swimming and diving injury cannot be construed as falling within the Athletics Policy's 'Covered Travel' provision."

The policy provision in question states that "covered travel" means team or group travel "supervised by staff members or a designated representative of the Sponsoring Organization." The policy neither defines "supervise" nor qualifies in any way the type or amount of supervision that must be provided. The final provision of the definition of "covered travel" does, however, utilize the word "supervision," and accordingly we find it helpful to review that provision. See Central Illinois, 213 Ill. 2d at 153 (when construing an insurance policy, we are to give effect to each provision, if possible, as it must be assumed that the parties to the policy intended each provision to serve a purpose). That provision states covered travel "begins with departing from the meeting place for such travel and ends upon the release of the insured from the Sponsoring Organization's supervision." The provision links the duration of the travel to the presence or absence of supervision and thus reflects an intent that the supervision provided be continuous from the beginning of the travel until the end of the travel.

In the instant case, the coaches communicated rules for the benefit of the players' safety and informed players that breaking those rules would subject them to discipline and potentially preclude them from playing in scheduled games. As plaintiff points out in his response brief on appeal, the players were subject to the coaches' directions as to where they ate, where they slept, and where they went outside of the baseball fields or the hotel and area immediately around it. The deposition testimony of plaintiff and Assistant Coach Huntley reflects that steps were taken, such as bed checks, to ensure compliance with those rules. Plaintiff's deposition testimony reflects that he was aware of these rules and that he was acting in accordance with them at the time he sustained his injury. We believe that the articulation of these rules and the steps taken to ensure that they were followed were consistent with the type of supervision intended by the policy provision in question. Accordingly, we conclude that plaintiff's compliance with those rules demonstrates there is no genuine issue of material fact that his travel activities at the time of his injury were supervised by the St. Ambrose coaching staff.

In support of its contention that plaintiff's travel was not being supervised at the time of his injury, defendant emphasizes Coach Callahan's deposition testimony that there were not any rules or restrictions as to where players could go on the "off day" and that players were basically free to do whatever they wanted. We are mindful of this testimony by Coach Callahan. However, we emphasize that he provided this testimony after discussing the rules to which players were subject throughout the trip. Those rules, as previously discussed, allowed players to remain in the area adjacent to the hotel, including the beach area adjacent to the hotel, without notifying the coaches of their specific whereabouts, but required players to notify one of the coaches if they planned to leave the area around the hotel and prohibited players from leaving that area without a

buddy. As previously noted, plaintiff was in compliance with those rules at the time of his injury.

As a final matter, we note that defendant contends that "covered travel" contemplates a separate coverage evaluation for each segment of team travel and argues that plaintiff's analysis "unreasonably assumes that Covered Travel must be a single all-encompassing event." Defendant reasons that plaintiff "fundamentally distorts Covered Travel into a provision that creates 24-hour-a-day comprehensive accident medical expense coverage during the entire Florida trip" and maintains that "[a]ny injury sustained during the spring break trip necessarily would fall under [plaintiff's] expansive notion of Covered Travel." According to defendant, plaintiff "fails to recognize that coverage may extend to certain segments of travel, but not to other segments of travel, depending upon whether the three prongs of the definition of Covered Travel have been satisfied for each leg of team travel."

We reject defendant's contention that determining what constitutes "covered travel" requires breaking down the team's trip to Florida into various segments. The policy issued by defendant does not provide for such segmentation by stating, for example, that "covered travel" ends when the players get off the plane or bus. Rather, the policy's provision stating that "covered travel" "begins with departing from the meeting place for such travel and ends upon the release of the insured from the Sponsoring Organization's supervision" reflects that the parties to the policy intended coverage to exist during the entire trip provided that the requirements included in subparagraphs (a), (b), and (c) of the definition of "covered travel" were satisfied. As discussed above, in the instant case all three of those requirements were satisfied.

Lastly, we note that our construction of "covered travel" does not create 24-hour-a-day comprehensive accident medical expense coverage during the entire Florida trip or provide that

14

any injury sustained during the trip will necessarily be covered. Plaintiff was not engaged in any type of frolic and detour in violation of the rules articulated by the St. Ambrose coaching staff. Rather, as already noted, he was acting subject to the supervision of the St. Ambrose coaching staff and in compliance with the coaching staff's team rules.

## CONCLUSION

Based on the foregoing reasons, we conclude that plaintiff was covered under the subject policy at the time he sustained his injury. Accordingly, we affirm the trial court order granting plaintiff's motion for summary judgment, and we affirm the trial court order denying defendant's motion for summary judgment.

Affirmed.

TULLY and GALLAGHER, JJ., concur.