Sarah HAAG, Gordon Haag and Cathy Haag; Molly Kruger, William Kruger, III, and Katherine F. Kruger; Angie Muir, Edward Muir and Lynn Muir; Julie M. Welch, Brian W. Welch and Susan A. Welch; Susan M. Pinnick, Patrick Pinnick and Jane Pinnick; Megan Reinhardt, Craig Reinhardt and Pamala Reinhardt; Jamie Stout, Mark Stout and Carol Stout; Crystal Wright, Denny Wright and Fina Wright, Appellants–Plaintiffs,

v.

Mark CASTRO, The Indiana Youth Soccer Association, Virginia Surety Company, Inc., Hartford Life and Accident Insurance Company, and K & K Insurance Group d/b/a K & K Insurance Agency, Inc., Appellees–Defendants.

No. 29A04–1001–CT–10.

Court of Appeals of Indiana.

Sept. 28, 2010.

Patrick A. Elward, Karl L. Mulvaney, Nana Quay–Smith, Bingham McHale LLP, Michael B. Langford, Scopelitis Garvin Light Hanson & Feary, Indianapolis, IN, Douglas D. Small, Foley & Small, South Bend, IN, Attorneys for Appellants.

Mark D. Gerth, Kightlinger & Gray, LLP, Indianapolis, IN, Attorney for Appellees.

## OPINION

MATHIAS, Judge.

Appellants Sarah Haag, et al. (collectively "the Team Members"), appeal the trial court's grant of summary judgment in favor of Appellee Virginia Surety Co., Inc. ("Virginia Surety").[1] The Team Members

---

1. We heard oral argument on this cause on July 12, 2010, at the Indiana Court of Appeals Courtroom in Indianapolis, Indiana. We thank counsel for their advocacy.

raise four issues, which we consolidate and restate as the following issue: Whether the trial court erred by determining that the injuries sustained in a rollover accident by the players of the Carmel Commotion Soccer Team were not covered by the Virginia Surety insurance policy issued to the Indiana Youth Soccer Association ("the IYSA").

Concluding that the trial court properly entered summary judgment in favor of Appellee Virginia Surety, we affirm.

### Facts and Procedural History

During 2004, the Team Members, all young women,[2] were members of the Carmel Commotion Soccer Team ("Carmel Commotion"). Carmel Commotion was one of a number of soccer teams fielded by the Carmel United Soccer Club, which in turn was an affiliated member in good standing of the IYSA. The IYSA is an Indiana not-for-profit corporation and is a governing body for youth soccer, charged with developing and promoting youth soccer in the State of Indiana in conjunction with the United States Youth Soccer Association, the United States Soccer Federation, and the United States Olympic Committee. In order to insure its activities, the IYSA acquired an insurance policy through Virginia Surety.

In June of 2004, Carmel Commotion applied to the IYSA to receive a permit to travel to Colorado to participate in a youth soccer tournament there. The trip to Colorado was organized by Mark Castro ("Castro"), the Carmel Commotion's coach and employee of the Carmel United Soccer Club. Castro was also certified by the IYSA as a soccer coach. After receiving the IYSA's approval to compete in the Colorado soccer tournament and prior to

leaving, Castro provided an itinerary to all the Team Members. The itinerary included a pre-planned time for an unspecified "[t]eam activity" on the afternoon of Saturday, June 12, 2004. Team Members' App. p. 644.

Upon Carmel Commotion's arrival in Colorado, Castro rented a passenger van for the team's use during the soccer tournament. At noon on June 12, 2004, Carmel Commotion had completed all soccer games and tournament related events for the day. The team returned to the hotel, and after lunch, the decision was made to go on a white water rafting trip as a team building activity. While travelling to the rafting activity, the van Castro had rented and was driving collided with another vehicle. The Team Members were injured as a result of this collision.

On June 7, 2006, the Team Members filed their Complaint for Declaratory Relief against Castro, the IYSA, Virginia Surety, and K & K Insurance Group,[3] seeking a declaration that Virginia Surety's policy, which was secured through the IYSA, provided coverage for the Team Members while Castro drove them to the team building white water rafting activity. Specifically, the policy provided for business auto coverage and extended coverage, under certain conditions, for liability arising out of the use of an automobile. The Covered Auto Designation Symbol Endorsement (CA 9954 7/97) attached to the business automobile coverage defines those autos covered as follows:

> With respect to hired Auto and employers non-ownership liability, the insured means the Named Insured, member associations and its clubs, leagues, teams, employees, volunteers, executive offi-

---

2. For purposes of this lawsuit, the Team Members are represented by their parents.

3. Defendants IYSA and K & K Insurance Group, have been dismissed from this cause through stipulations of dismissals.

cers, directors, shareholders, therein but only *while the automobile is being used in the business of the Named Insured.* Coverage is not provided on behalf of the parents, managers, coaches, umpires, officials, referees, of the insured or volunteers using any automobile "personally owned, leased, borrowed or employer-furnished" *in the transportation of youth or adult participants to or from athletic games or athletic events, including but not limited to practices, exhibitions, post-season and scheduled events.*

Team Members' App. p. 101 (emphasis added).

On June 26, 2009, Virginia Surety filed its motion for summary judgment and evidentiary designation denying coverage to the Team Members for the injuries sustained in the collision. On June 30, 2009, the Team Members filed their cross-motion for summary judgment against Virginia Surety along with a designation of evidence. The parties each responded to the other's motion for summary judgment. On November 24, 2009, the trial court conducted a hearing on the cross-motions for summary judgment. On December 10, 2009, the trial court summarily granted Virginia Surety's motion for summary judgment while it denied the Team Members' motion for summary judgment. The Team Members now appeal. Additional facts will be provided as necessary.

### Standard of Review

This cause comes before this court as an appeal from a granted motion for summary judgment. Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same

standards in deciding whether to affirm or reverse summary judgment. *First Farmers Bank & Trust Co. v. Whorley*, 891 N.E.2d 604, 607 (Ind.Ct.App.2008), *trans. denied.* Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 607–08. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* at 608.

The party appealing summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Id.* Accordingly, a granted summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Id.*

### Discussion and Decision

Insurance policies are governed by the same rules of construction as other contracts. *Briles v. Wausau Ins. Companies*, 858 N.E.2d 208, 213 (Ind.Ct.App. 2006). As with other contracts, the interpretation of an insurance policy is a question of law. *Id.* When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. *Id.* We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs. *Id.* If the language is clear and unambiguous, we give the language its plain and ordinary meaning. *Id.* An ambiguity exists where the provision is susceptible to more than one interpretation and reasonable persons

would differ as to its meaning. *Id.* However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language. *Id.* We must accept an interpretation of the contract language that harmonizes the provisions, rather than one that supports conflicting versions of the provisions. *Id.* Additionally, the power to interpret contracts does not extend to changing their terms and we will not give insurance policies an unreasonable construction to provide additional coverage. *Id.*

The Virginia Surety policy issued to the IYSA provided for business auto coverage as follows:

> With respect to hired Auto and employers non-ownership liability, the insured means the Named Insured, member associations and its clubs, leagues, teams, employees, volunteers, executive officers, directors, shareholders, therein but only *while the automobile is being used in the business of the Named Insured.* Coverage is not provided on behalf of the parents, managers, coaches, umpires, officials, referees, of the insured or volunteers using any automobile "personally owned, leased, borrowed or employer-furnished" *in the transportation of youth or adult participants to or from athletic games or athletic events, including but not limited to practices, exhibitions, post-season and scheduled events.*

Team Members' App. p. 101 (emphasis added).

■ To resolve the issue before us we are required to interpret the phrase "used in the business of" the IYSA. The designated evidence reflects that Carmel Commotion is fielded by the Carmel United Soccer Club, which in turn was an affiliated member in good standing of the IYSA. Castro is an employee of Carmel Commotion and a certified coach under IYSA's

licensing requirements. As a result, Castro clearly falls within the initial insured classifications listed in the insurance policy. The question then becomes whether Castro's use of the van to transport the Team Members was "being used in the business of the Named Insured" at the time of the accident.

In their briefs, the parties cite to *Liberty Mutual Insurance Co. v. Connecticut Indemnity Co.*, 55 F.3d 1333, 1335 (7th Cir.1995), in which the Seventh Circuit Court of Appeals construed Indiana law in interpreting an insurance policy's use of the phrase "while used in the business of." *Id.* at 1335. The court found that, although the interpretation of the term was a question of contractual interpretation, Indiana cases addressing the doctrine of *respondeat superior* are persuasive to evaluate the issue to the extent that they provide an indication as to what sort of activities Indiana courts typically believe are contemplated by the words "in the business of." *Id.* As such, the *Liberty Mutual* court relied on *Gibbs v. Miller*, 152 Ind.App. 326, 283 N.E.2d 592, 594–95 (1972), where we stated that "[t]he general test in determining the existence of a master-servant relationship is the right to direct and control the conduct of the alleged servant at the time the negligent act occurred." Moreover, the *Gibbs* court emphasized that the test refers only to the *right* to control not actual control, especially where the work does not require a great deal of supervision. *Id.* at 595. In addition to the right to control, the *Liberty Mutual* court noted two other factors applied by Indiana courts: (1) whether the activities of the servant confer a benefit to the master and (2) whether the servant was in the service of the master. 55 F.3d at 1337 n. 5 (quoting *Konradi v. United States*, 919 F.2d 1207, 1212–13 (7th Cir. 1990)).

The Team Members contend that the IYSA's business is the promotion of youth soccer and, in furtherance of this mission, the IYSA approved Carmel Commotion's participation in the out-of-state soccer tournament they were attending at the time of the accident. As such, the Team Members claim that Carmel Commotion's "related soccer team activities [were] part and parcel of the business of the IYSA[.]" Team Members' Br. at 12.

On the other hand, Virginia Surety argues that while the IYSA sanctioned Carmel Commotion's attendance and competition at the tournament, the IYSA did not regulate or control the out-of-state tournament or the activities of the Team Members while attending the tournament. Therefore, Virginia Surety maintains that the Team Members' use of the van to go white water rafting was not a use "in the business of the Named Insured" under the policy. We agree.

The IYSA's Articles of Incorporation state the purpose of the organization as

SECTION 1. To develop, promote and administer the game of soccer among Youth under 19 years of age residing within the State of Indiana.

SECTION 2. To encourage and assist in the development and growth of community leagues, associations, organizations, programs and teams so that soccer is made available to more Indiana residents in all levels of competition.

SECTION 3. To develop and encourage sportsmanship and playing proficiency by all players and persons involved in soccer in the State of Indiana.

SECTION 4. To affiliate with USYSA and to encourage registration of all Indiana Youth teams with the USYSA.

SECTION 5. To conduct tournaments of Youth team competition and to sanction said teams to enter and participate in said tournaments.

SECTION 6. To do any and all other acts necessary or desirable in the furtherance of the foregoing purposes and for the good of Youth soccer.

Team Members' App. p. 815. Thus, the Articles of Incorporation—and specifically Section 5—indicate that the IYSA's mission or business encompasses the organization of competitive soccer teams and their participation in soccer tournaments. Whereas the Articles are ambiguous as to whether Section 5 is geographically limited to the State of Indiana or can be read to include out-of-state tournaments, the IYSA's Playing Rules explicitly contemplate opportunities for travel to and participation in out-of-state tournaments.

The parties do not dispute that before Carmel Commotion is allowed to attend an out-of-state soccer tournament, the team needs to receive permission from the IYSA. Rule 2.6 of the IYSA's Playing Rules states, in pertinent part:

**RULE 2.6 OUT–OF–STATE PLAY (USYSA RULE 4032, SECTION 3–B)**

A resident of Indiana must register with IYSA in order to be eligible to play in another U.S. Youth Soccer state association. Players are also insured through the state of residence. Failure to register in Indiana will place the player in bad standing with the USYSA and invalidate the player's insurance coverage.

Team Members' App. p. 829. With respect to the permission to travel, Playing Rule 3.6 proscribe the following, in pertinent part:

A} Out-of-state tournaments: Teams participating in United States tournaments outside the state of Indiana must make sure the tournament has been sanctioned [ ] by their National State Association and USYSA.

\*     \*     \*

C} Permission to travel—Traveling with this permit guarantees the host state that the players are properly registered, are the appropriate age group, are covered by insurance, and that the team or its players are not under any disciplinary sanctions.

&ast; No later than fourteen (14) days in advance of the departure date, a completed Permit to Travel (must be original—no faxes) must be submitted to IYSA for approval along with the appropriate fee. An additional fee may be made payable to IYSA for an application submitted less than fourteen days in advance.

&ast; A copy of the IYSA approved Permit to Travel shall be presented to the host tournament director by the traveling team.

Team Members' App. p. 835.

Reading the IYSA's Articles of Incorporation together with its Playing Rules clarifies that the IYSA not only promotes soccer for youth residing in Indiana but also encourages Indiana's soccer teams' participation in out-of-state tournaments. The organizational documents establish specific rules that member participants must follow prior to being allowed to travel out-of-state and being covered by insurance.

However, the IYSA's playing rules do not require the team to submit an itinerary with its application for a Permit to Travel. There is nothing in the playing rules from which we could conclude that the IYSA's requirement of a Permit to Travel grants it the right to control a traveling soccer team's activities and itinerary during their out-of-state travel. To the contrary, the IYSA's purpose in requiring a Permit to Travel is simply 1) to grant the IYSA the

right to control which out-of-state sanctioned tournaments its traveling teams participate in, and 2) to guarantee to the out-of-state tournament that the Indiana's traveling team's players are eligible and registered with the IYSA. Moreover, as Virginia Surety observes in its brief, once the Permit to Travel is issued, the IYSA has no further involvement in the traveling team's participation in the out-of-state tournament.

It is undisputed that at the time of the accident Castro and Carmel Commotion team members were not traveling to an event related to the soccer tournament. In fact, the team had completed all soccer tournament related events for the day before the accident occurred. The players and their coach were engaged in travelling to a leisure activity, white water rafting, which the coach characterized as a team building exercise. Furthermore, the decision to participate in a white water rafting activity was made after the team arrived in Colorado for the tournament. The IYSA did not have knowledge of or authorize the white water rafting activity.

Because the designated evidence does not establish that the IYSA had the right to control Carmel Commotion's activities while attending the out-of-state soccer tournament, we conclude that Castro was not using the rented van "in the business of" the IYSA when he was transporting the team to a white water rafting activity unrelated to the out-of-state soccer tournament the team received the IYSA's permission to attend. Under the terms of the Virginia Surety insurance policy and the facts and circumstances before us, we hold that Castro's use of the van was not covered under the policy.[4] Accordingly, we

---

4. Because we conclude that the accident is not covered under the terms of Virginia Surety's insurance policy, we do not need to address the Team Members' remaining arguments concerning the policy exclusion and

affirm the trial court's summary judgment in favor of Virginia Surety.

Affirmed.

BRADFORD, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting with separate opinion.

I respectfully dissent from the majority's decision affirming the trial court's grant of summary judgment in favor of Virginia Surety. Based on the designated evidence before me, I would reverse the trial court because coach Castro was clearly acting in the business of the IYSA to promote soccer for Indiana soccer teams when he drove the Carmel Commotion to the white water rafting activity and this team building activity does not fall within the confines of the exclusionary clause of Virginia Surety's policy.

In its decision, the majority concludes that Castro's use of the van to go white water rafting was not a use "in the business of the Named Insured" because the IYSA did not have the right to control the team building activity, as interpreted within the confines of the *Liberty Mutual* decision. I disagree.

I agree that a review of the IYSA's Articles of Incorporation together with its Playing Rules clarifies that the IYSA not only promotes soccer for youth residing in Indiana but also encourages participation in out-of-state tournaments. Although the majority in its determination of the business of the IYSA relies on IYSA's Playing Rule 3.6(C), it fails to give any credence to the Rule's very specific statement that:

> Permission to travel—Traveling with this permit guarantees the host state that the players are properly registered, are the appropriate age group, *are cov-*

whether the policy exclusion renders the cov-

*ered by insurance,* and that the team or its players are not under any disciplinary sanctions.

(Appellants' App. p. 835) (emphasis added). In other words, the issuance of a permission to travel by the IYSA also serves as a strong indicator that the Team Members are covered by insurance for the out-of-state tournament. Nothing in the designated evidence curtails this broad statement of IYSA's potential coverage, nor is this statement in the Rules limited by the language of Virginia Surety's insurance. The majority appears to implicitly acknowledge this by its statement that "[t]he organizational documents establish specific rules that member participants must follow prior to being allowed to travel out-of-state and being covered by insurance." Op. p. 195. Carmel Commotion followed all these rules, and therefore, without any other limitations placed on insurance coverage, should have been entitled to assume that they were covered for the duration of the trip, regardless of the activities scheduled.

Furthermore, the IYSA clearly had the right to control Carmel Commotion's out-of-state participation and the time spent while partaking in the tournament. Not only was Carmel Commotion required to receive IYSA's permission prior to attending, but it also had to pay fees and the Team Members were required to carry certain documents with them. Regardless of its awareness of Carmel Commotion's team building activity on June 12, 2004, the IYSA was in control of the trip because the IYSA could have withheld the permit to travel, as was its right; however, by issuing the permit they implicitly and without any limitations assured that the Team Members were insured during the duration of the trip. Moreover, partic-

erage illusory.

ipation in the Colorado soccer tournament benefitted the IYSA as it reflected positively upon Indiana's soccer playing youth and the white water rafting activity equally advanced the IYSA's purpose as it built the players' team-playing skills, and as such, white water rafting is undisputedly related to soccer and the tournament.

Although I conclude that coach Castro was an insured and used the rental car in the business of the IYSA when transporting the team to the white water rafting activity, I also need to analyze if the policy's exclusion language applies to the facts before us; specifically, whether the white water rafting activity can be characterized as an "athletic game or athletic event, including but not limited to practices, exhibitions, post season and scheduled events," for which coverage is excluded under Virginia Surety's policy. (Appellants' App. p. 101).

Exclusion clauses do not grant or enlarge coverage; rather, they are limitations or restrictions on the insuring clause. *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1278 (Ind.1980). Thus, when interpreting an exclusionary clause of an insurance policy, the clause must clearly and unmistakably include within its scope the particular act or omission that will bring the exclusion into play in order to exclude coverage. *Great Lakes Chemical Corp. v. Int'l Surplus Lines Ins. Co.*, 638 N.E.2d 847, 850 (Ind.App.1994). Just as an ambiguous insurance policy is not to be construed to remove from coverage a risk against which an insured intended to protect himself, so too, an exclusionary clause is not to be read so loosely that it would effectively exclude coverage of all operations. *Id.*

Here, the policy's exclusion is clearly limited to "athletic games" or "athletic events." Although the policy attempts to clarify these two terms with referencing

examples such as "practices, exhibitions, post season and scheduled events," by inserting the phrase "including but not limited to," these identified examples reflect what all can be considered an "athletic game" or "athletic event" but do not expand the original exclusionary language. Therefore, in order to be excluded from coverage, the disputed activity must first fall within the confines of an "athletic game" or "athletic event."

As with the coverage issue, the definition section of the Business Auto Coverage does not define the terms "athletic game" or "athletic event." Therefore, the words must be given their plain or ordinary meaning. *Briles*, 858 N.E.2d at 213. When determining the plain and ordinary meaning of a term, we may use language dictionaries, as well as consider the relationship with other words and phrases. *State v. D.M.Z.*, 674 N.E.2d 585, 588 (Ind. Ct.App.1996), *trans. denied.*

According to Websters Third New International Dictionary (1993), "athletic" is defined as "having the characteristics of or befitting an athlete: strong, muscular, robust, vigorous, agile, active." "Game" is explained by the same dictionary as "a physical or mental competition conducted according to rules in which the participants play in direct opposition to each other, each side striving to win and to keep the other side from doing so" and "event" is an "occurrence" or "any one of the contests in a program of sports."

At noon on the day of the accident, Carmel Commotion had completed all its soccer games and other related events for the day. The team had returned to the hotel and all the players had showered and changed. The itinerary included a preplanned time for an unspecified "[t]eam activity" on the afternoon of Saturday, June 12, 2004. (Appellants' App. p. 644). Accordingly, after lunch, the decision was

made to go on a white water rafting trip as a team building activity. I find that this activity was neither an "athletic game" nor an "athletic event."

Although white water rafting could be characterized as athletic, it falls outside the definitions of game or event. The decision to go white water rafting was a spur-of-the-moment choice and served as an activity to bring the team together. It did not include soccer or any other contest that required an incentive to win. Even if the controlling requirement of "athletic game" or "athletic event" could be ignored and I apply the examples given in the policy independently as Virginia Surety urges us to do, I still reach the same conclusion. The white water rafting trip was not a "practice, exhibition, post season [or] scheduled event." Carmel Commotion was not travelling to a soccer practice or exhibition, and its soccer season was still ongoing. Furthermore, the rafting trip was not scheduled as the itinerary simply stated "Afternoon—Team Activity." (Appellants' App. p. 644).

In sum, I conclude that coach Castro was acting in the business of the IYSA to promote soccer for Indiana soccer teams when he drove the Carmel Commotion to the white water rafting activity and this team building activity does not fall within the confines of the exclusionary clause of Virginia Surety's policy.