ATTORNEYS FOR APPELLANTS
Michael B. Langford
Indianapolis, Indiana

Douglas D. Small
South Bend, Indiana

Patrick A. Elward
Karl L. Mulvaney
Nana Quay-Smith
Indianapolis, Indiana

ATTORNEY FOR APPELLEES
Mark D. Gerth
Indianapolis, Indiana



FILED
Jan 10 2012, 10:54 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 29S04-1102-CT-118

SARAH HAAG, GORDON HAAG AND
CATHY HAAG; MOLLY KRUGER, WILLIAM
KRUGER, III, AND KATHERINE F. KRUGER;
ANGIE MUIR, EDWARD MUIR AND LYNN MUIR;
JULIA M. WELCH, BRIAN W. WELCH AND
SUSAN A. WELCH; SUSAN M. PINNICK, PATRICK
PINNICK AND JANE PINNICK; MEGAN REINHARDT,
CRAIG REINHARDT AND PAMALA REINHARDT;
JAMIE STOUT, MARK STOUT AND CAROL STOUT;
CRYSTAL WRIGHT, DENNY WRIGHT AND
FINA WRIGHT,

*Appellants (Plaintiffs below)*,

v.

MARK CASTRO, THE INDIANA YOUTH SOCCER
ASSOCIATION, VIRGINIA SURETY COMPANY,
INC., HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY, AND K & K INSURANCE
GROUP D/B/A K & K INSURANCE AGENCY, INC.,

*Appellees (Defendants below)*.

Appeal from the Hamilton Circuit Court, No. 29C01-0606-CT-576
The Honorable Paul Felix, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 29A04-1001-CT-10

**January 10, 2012**

**Sullivan, Justice.**

Players on a local youth soccer team seek to recover under the state youth soccer govern-ing association's business auto-insurance policy for injuries sustained when the van in which they were riding was involved in an accident. Because the van was not being used in the busi-ness of the association, a condition for coverage under the insurance policy at issue, the injured players may not recover.

**Background**

The plaintiffs in this case were players (or parents of players) on a soccer team called Carmel Commotion. Carmel Commotion was one of a number of teams fielded by the Carmel United Soccer Club in 2004. The Carmel United Soccer Club is an affiliated member in good standing of the Indiana Youth Soccer Association ("IYSA"). The IYSA is a not-for-profit corpo-ration that governs youth soccer in Indiana; it is charged with developing and promoting youth soccer in Indiana in conjunction with various national organizations.

In June, 2004, Carmel Commotion traveled with the IYSA's approval to Colorado to par-ticipate in a youth soccer tournament. Mark Castro, the team's IYSA-certified coach, organized the trip.

On June 12, 2004, while attending the soccer tournament in Colorado, the team decided to go on a white-water rafting trip as a "team-building" activity. Castro transported the players

to the rafting activity in a passenger van that he had rented for the team's use during the trip. While en route, the van collided with another vehicle, resulting in injuries to several players.

The injured players, by their parents (referred to collectively as "Players"), sued Castro and the IYSA's insurance carrier, Virginia Surety Co., Inc. (The IYSA itself and another party were also named as defendants but were later dismissed by stipulation.) The Players sought a declaration that the IYSA's insurance policy through Virginia Surety provided coverage while Castro drove them to the white-water rafting activity. Both Virginia Surety and the Players moved for summary judgment. Following a hearing, the trial court granted summary judgment in favor of Virginia Surety.

A divided panel of the Court of Appeals affirmed, the majority holding under the relevant insurance policy language that Castro was not using the rented van "in the business of" the IYSA at the time of the accident. Haag v. Castro, 934 N.E.2d 189, 195-96 (Ind. Ct. App. 2010).

The Players sought, and we granted, transfer, Haag v. Castro, 950 N.E.2d 1200 (Ind. 2011) (table), thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).

**Discussion**

**I**

Virginia Surety issued a commercial lines policy to the IYSA that provided business auto coverage in certain circumstances. At issue in this case is an endorsement for "hired" (rented) vehicles that reads as follows:

> With respect to hired auto and employers non-ownership liability, the insured means the named insured, member associations and its clubs, leagues teams, employees, volunteers, executive officers, directors, stockholders, therein, but only while the automobile is being used in the business of the Named Insured. Coverage is not provided on behalf of the parents, managers, coaches, umpires, officials, referees, of the insured or volunteers using any automobile (personally owned, leased, borrowed or employer furnished) in the transportation of youth or

3

adult participants to and from athletic games or athletic events, including but not limited to practices, exhibitions, post season and scheduled events.

Appellants' App. 101 (emphasis added).

The Players make three arguments about this endorsement.

First, they contend that under the first sentence of the endorsement, the rented van in which they were riding was being used in the business of the IYSA.

Second, they contend that the second sentence of the endorsement does not apply because they were not traveling to an athletic game or event; rather, they were traveling to a "team-building" event.

Third, they contend that the endorsement must be construed to provide coverage in these circumstances because if it is not, coverage would not be available under any reasonably expected set of circumstances and, therefore, would be "illusory."

**II**

As the Court of Appeals recognized, Castro may well be an "insured" under the policy. Haag, 934 N.E.2d at 193. But the dispositive issue is whether Castro was using the rented van "in the business of" the IYSA at the time of the accident.

The policy does not define "in the business of" and the Players argue that this creates an ambiguity that should be construed against the insurer. Of course, that a policy does not define a term does not necessarily make the term ambiguous. Wagner v. Yates, 912 N.E.2d 805, 810 (Ind. 2009). Furthermore, "an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party." Id. (citing Beam v. Wausau Ins. Co., 765 N.E.2d 524, 528 (Ind. 2002)). We find that the IYSA's organizational documents combined with widespread general familiarity with the business of sports governing bodies render the term unambiguous here. To the extent that Lea v. St.

4

<u>Paul Fire and Marine Insurance Co.</u>, 306 So. 2d 740, 743 (La. 1975), cited by the Players, holds to the contrary, we respectfully disagree with our Louisiana colleagues.

And in fact, the Players as well as Virginia Surety direct us to the IYSA's organizational documents for insight into its "business." The IYSA's Articles of Incorporation declare its relevant purposes as follows:

> SECTION 1. To develop, promote and administer the game of soccer among Youth under 19 years of age residing within the State of Indiana.
>
> SECTION 2. To encourage and assist in the development and growth of community leagues, associations, organizations, programs and teams so that soccer is made available to more Indiana residents in all levels of competition.
>
> SECTION 3. To develop and encourage sportsmanship and playing proficiency by all players and persons involved in soccer in the State of Indiana.
>
> SECTION 4. To affiliate with USYSA and to encourage registration of all Indiana Youth teams with the USYSA.
>
> SECTION 5. To conduct tournaments of Youth team competition and to sanction said teams to enter and participate in said tournaments.
>
> SECTION 6. To do any and all other acts necessary or desirable in the furtherance of the foregoing purposes and for the good of Youth soccer.

Appellants' App. 815. The IYSA also has a set of "Playing Rules" that "are intended to provide a uniform set of guidelines governing: player eligibility, registration, team formation, player assignments, playing rules, and standards of Sportsmanship and conduct for all Member Organizations." <u>Id.</u> at 820, 825.

We read these organizational documents to identify three lines of endeavor or "business" for the IYSA: (1) "promoting" soccer; (2) "regulating" competition, leagues, teams, and players (e.g., registering teams, certifying coaches and referees, sanctioning participation in tournaments, etc.); and (3) "conducting" specific events. Thus, when the Virginia Surety policy requires that the automobile be "used in the business of the [IYSA]" for there to be coverage, the policy re-

quires that the automobile be used in one of these three lines of business – "promoting," "regulating," or "conducting."

Perhaps because our state is home to so many sports governing bodies, there is widespread general familiarity with their business. These bodies are not in the business of "competing" in athletic events – their business is promoting, regulating, and sometimes sponsoring competition. Likewise, the IYSA is not in the business of "competing." It is a state governing body, acting in conjunction with the United States Youth Soccer Association, the United States Soccer Federation (also known as U.S. Soccer, the national governing body of the sport),[1] and the United States Olympic Committee.

---

[1] See History – U.S. Soccer, http://www.ussoccer.com/About/History.aspx (last visited Jan. 6, 2012); About U.S. Soccer – U.S. Soccer, http://www.ussoccer.com/About/About-Home.aspx (last visited Jan. 6, 2012). Pursuant to the Ted Stevens Olympic and Amateur Sports Act, the United States Olympic Committee may recognize an eligible amateur sports organization as the "national governing body" for a sport. 36 U.S.C. § 220521 (2006). Under 36 U.S.C. § 220524, a national governing body has the following general duties for the sport that it governs:

(1) develop interest and participation throughout the United States and be responsible to the persons and amateur sports organizations it represents;

(2) minimize, through coordination with other amateur sports organizations, conflicts in the scheduling of all practices and competitions;

(3) keep amateur athletes informed of policy matters and reasonably reflect the views of the athletes in its policy decisions;

(4) disseminate and distribute to amateur athletes, coaches, trainers, managers, administrators, and officials in a timely manner the applicable rules and any changes to such rules of the national governing body, the corporation, the appropriate international sports federation, the International Olympic Committee, the International Paralympic Committee, and the Pan-American Sports Organization;

(5) allow an amateur athlete to compete in any international amateur athletic competition conducted by any amateur sports organization or person, unless the national governing body establishes that its denial is based on evidence that the organization or person conducting the competition does not meet the requirements stated in section 220525 of this title;

(6) provide equitable support and encouragement for participation by women where separate programs for male and female athletes are conducted on a national basis;

(7) encourage and support amateur athletic sports programs for individuals with disabilities and the participation of individuals with disabilities in amateur athletic activity, including, where feasible, the expansion of opportunities for meaningful participation by individuals with disabilities in programs of athletic competition for able-bodied individuals;

(8) provide and coordinate technical information on physical training, equipment design, coaching, and performance analysis; and

(9) encourage and support research, development, and dissemination of information in the areas of sports medicine and sports safety.

The Players argue that their participating in the Colorado soccer tournament was "in the business of" the IYSA (and therefore the use of the rented van was "in the business of" the IYSA) because the IYSA not only explicitly approved but also encouraged them to participate in the tournament. They reason that "[t]he business of the IYSA involves the organization of competitive soccer teams and their participation in soccer tournaments such as the tournament in June, 2004 in Colorado." Appellants' Br. 21. Thus, they argue that "any transportation from the time the team commenced their trip to Colorado for the tournament until the time they returned to Indiana was in furtherance of the business of the IYSA." Id.[2]

To interpret the endorsement's "in the business of" language, the majority of the Court of Appeals panel relied on respondeat superior principles. Haag, 934 N.E.2d at 193-95 (citing Liberty Mut. Ins. Co. v. Conn. Indem. Co., 55 F.3d 1333, 1335-37 (7th Cir. 1995)).[3] While it may be that respondeat superior analysis could be helpful in such situations, we believe that here only a straightforward application of the plain language of the policy is necessary to resolve the question. "'An insurance policy that is unambiguous must be enforced according to its terms, even those terms that limit an insurer's liability.'" Prop.-Owners Ins. Co. v. Ted's Tavern, Inc., 853 N.E.2d 973, 978 (Ind. Ct. App. 2006) (alteration deleted) (quoting Amerisure, Inc. v. Wurster Constr. Co., 818 N.E.2d 998, 1002 (Ind. Ct. App. 2004)). This policy covers the IYSA in the event that it is subject to liability because of an auto accident if, and only if, a hired or non-owned automobile is being "used in the business of" that organization – either (1) promoting soccer or (2) regulating leagues, teams, players, and referees or (3) conducting specific events. Simply stated, neither Carmel Commotion nor Castro were doing any of those things and so the accident was not covered.

---

[2] The Players cite Regan v. Mutual of Omaha Insurance Co., 874 N.E.2d 246 (Ill. App. Ct. 2007) in support of their argument that coverage is available here. The insurance policy at issue in Regan provided coverage for "covered travel." 874 N.E.2d at 251-52. There is no analogous provision in the policy before us. As Regan depended on policy language not found in the present case, we reject the Players' general assertion that "[i]nsurance for athletic teams is effective from the time the team leaves until the time it returns." Pet. to Transfer 8.

[3] The court in Liberty Mutual interpreted "in the business of" to mean furthering commercial interests. 55 F.3d at 1335 (citing Hartford Ins. Co. v. Occidental Fire & Cas. Co., 908 F.2d 235, 239 (7th Cir. 1990)). We agree with the Players that a similar interpretation is not appropriate in the present case. The IYSA is a not-for-profit entity with no apparent "commercial interests."

What Carmel Commotion (with Castro's help) was doing was participating in a specific event, a soccer tournament; Carmel Commotion's "business" is competing – along with the practicing, "team-building," and the like that comes with it. And while the IYSA promotes tournaments and regulates who plays in tournaments and even sponsors tournaments, as discussed above, the IYSA itself does not compete. The IYSA promotes soccer. It regulates playing soccer. It conducts soccer tournaments. But when an IYSA-registered team, with the help of its coach, competes in a tournament (even a tournament sponsored or sanctioned by the IYSA), the team is engaged in its own business, not that of the IYSA.

Examining the second sentence of the endorsement helps in understanding this point. It specifies that the policy does not cover any automobiles used "in the transportation of youth or adult participants to and from athletic games or athletic events." Why not? Because participating in the soccer games themselves – the competition – is not the business of the IYSA. (In this regard, the second sentence of the endorsement is not an "exclusion" but an amplification of the endorsement's limitation of the coverage of hired or non-owned automobiles to those being "used in the business.")

The fact that coverage is not available here does not make the coverage the IYSA purchased "illusory." "Coverage under an insurance policy is not illusory unless the policy would not pay benefits under any reasonably expected set of circumstances." Lexington Ins. Co. v. Am. Healthcare Providers, 621 N.E.2d 332, 339 (Ind. Ct. App. 1993) (citing Meridian Mut. Ins. Co. v. Richie, 544 N.E.2d 488 (Ind. 1989)), trans. denied. That the IYSA might need auto-liability insurance in respect of hired or non-owned vehicles is clear. In the course of traveling to promote youth soccer or in transporting a celebrity guest – perhaps a member of our national team like Lauren Cheney or Lori Lindsey – to an IYSA sponsored event, an employee or volunteer might be involved in an auto accident while using a rented vehicle. The coverage is not illusory.

In her dissent in the Court of Appeals, Judge Riley presses the importance she places on the IYSA's explicit approval of the Colorado trip. Pointing to IYSA Playing Rule 3.6-2's provision that teams traveling with a permit are covered by insurance, she maintains that because

8

Carmel Commotion followed all the rules for traveling out-of-state, the team, "without any other limitations placed on insurance coverage, should have been entitled to assume that they were covered for the duration of the trip, regardless of the activities scheduled." Haag, 934 N.E.2d at 196 (Riley, J., dissenting). This is a highly respectable argument but it does not go to the construction of the "used in the business of" endorsement. We have not been asked to decide whether the Players had any claim against IYSA, only whether Virginia Surety has liability under the endorsement.

**Conclusion**

Because Castro was not using the automobile "in the business" of the IYSA, the policy provides no coverage. The judgment of the trial court is affirmed.

Shepard, C.J., concurs.

Rucker, J., concurs in result.

Dickson, J., dissents with separate opinion.

David, J., not participating.

9

**Dickson, Justice, dissenting.**

The Court's decision is predicated on its application of the insurance endorsement language adding coverage for "hired" (rented) vehicles but limiting the scope of those "insured" by the phrase "but only while the automobile is being used *in the business of* the Named Insured [the Indiana Youth Soccer Association ('IYSA')]." Haag v. Castro, ___ N.E.2d ___ (Ind. 2012) (emphasis added). I believe this insurance contract is ambiguous and thus should be construed to provide coverage under Indiana law.

It is a well settled rule that insurance contracts are, in the first instance, "subject to the same rules of interpretation as are other contracts." Eli Lilly and Co. v. Home Ins. Co., 482 N.E.2d 467, 470 (Ind. 1985); *see also* Am. States Ins. Co. v. Kiger, 662 N.E.2d 945, 947 (Ind. 1996) ("The interpretation of insurance policies is not a new task for this Court."). Accordingly, when the language of an insurance policy is clear and unambiguous, it will be enforced according to its plain and ordinary meaning. Eli Lilly, 482 N.E.2d at 470. But "'[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the standpoint of the insured." Bosecker v. Westfield Ins. Co., 724 N.E.2d 241, 244 (Ind. 2000) (alteration in original) (quoting Kiger, 662 N.E.2d at 947). This is one of those "special rules of construction of insurance contracts . . . developed due to the disparity in bargaining power between insurers and the insured[]." Allstate Ins. Co. v. Boles, 481 N.E.2d 1096, 1101 (Ind. 1985). This approach is longstanding,[1] and is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." Kiger, 662 N.E.2d at 947. Thus, "if reasonable persons may honestly differ as to the meaning of the policy language," that ambiguous language "should be construed to further the policy's basic purpose of indemnity." Eli Lilly,

---

[1] *See, e.g.*, Masonic Accident Ins. Co. v. Jackson, 200 Ind. 472, 481, 164 N.E. 628, 631 (1929) ("It is elementary in the construction of insurance policies that where insurance contracts are so drawn as to be ambiguous or require interpretation or are fairly susceptible of two different constructions so that reasonably intelligent men on reading them would honestly differ as to their meaning, the courts will adopt that construction most favorable to the insured."); Rogers v. Phoenix Ins. Co., 121 Ind. 570, 577, 23 N.E. 498, 500 (1890) ("[W]hen an insurance company tenders a policy to a party seeking to be insured, and uses in the policy ambiguous words, these words will be held to have the meaning most favorable to the insured, as the presumption is that on this construction he took the policy.").

482 N.E.2d at 470; *see also* <u>Bosecker</u>, 724 N.E.2d at 244 ("Ambiguities are construed strictly against the insurer to further the general purpose of the insurance contract to provide coverage.").

Considering the disputed policy language and giving its words "their plain, ordinary, and popularly accepted meanings," <u>USA Life One Ins. Co. of Ind. v. Nuckolls</u>, 682 N.E.2d 534, 539 (Ind. 1997), the insurance contract language appears ambiguous. The provision in dispute, an endorsement providing coverage for automobile use, states:

> With respect to hired auto and employers non-ownership liability, the insured means the named insured, member associations and its clubs, leagues, teams, employees, volunteers, executive officers, directors, stockholders, therein, *but only while the automobile is being used in the business of the Named Insured.* Coverage is not provided on behalf of the parents, managers, coaches, umpires, officials, referees, of the insured or volunteers using any automobile (personally owned, leased, borrowed or employer furnished) in the transportation of youth or adult participants to and from athletic games or athletic events, including but not limited to practices, exhibitions, post season and scheduled events.

Appellants' App'x at 101 (emphasis added). There is no dispute that the Carmel Commotion was a "team" from a "member association" riding in a "hired auto" at the time of the accident. The Court and the parties are then correct that the question turns on whether the "automobile [was] being used in the business of the [IYSA]." But I disagree with the Court's narrow characterization of the "business" of the IYSA in light of the designated evidence.

The Court views the "business" of the IYSA as "(1) 'promoting' soccer; (2) 'regulating' competition, leagues, teams, and players . . . ; and (3) 'conducting' specific events," but opines that the "IYSA is not in the business of 'competing,'" and since the Carmel Commotion was in Colorado to compete it was "engaged in its own business, not that of the IYSA." <u>Haag</u>, ___ N.E.2d at ___. But the IYSA's Articles of Incorporation, designated to the trial court on summary judgment, paint a broader picture of the IYSA's "business." One of the purposes of the IYSA, explained by its Articles of Incorporation, is "To develop and encourage sportsmanship and playing proficiency by all players and persons involved in soccer in the State of Indiana." Appellants' App'x at 815. "[P]laying proficiency" in the game of soccer is not encompassed within "promoting," "regulating," or "conducting." Proficiency is "Performing in a given art, skill, or branch of learning with expert correctness or facility." American Heritage Dictionary 989 (2d college ed. 1982). Thus, one of the stated purposes of the IYSA evinces a goal of culti-

2

vating and strengthening adept performance *on the field*.[2] The vehicle for evaluating the success or failure of this goal is *competing*. This was precisely the purpose for the Carmel Commotion's trip to Colorado, to demonstrate its playing proficiency in a tournament in which they could not compete without the blessing of the IYSA.

Additionally, "promoting soccer" embraces interstate travel to engage in competitive sport as an incentive to the youth of Indiana to participate in soccer under the IYSA. To the extent the Carmel Commotion achieved success in the Colorado tournament, the purposes of the IYSA would be further served. The publicity associated with championship level play by an IYSA team, however minimal, surely "promotes" soccer. Thus, the Carmel Commotion's participation in the Colorado tournament, as an IYSA team, served to "promote . . . the game of soccer among Youth under 19 years of age residing within the State of Indiana." Appellants' App'x at 815.

The Carmel Commotion's Colorado trip could thus be reasonably understood as being "in the business of" the IYSA. Indiana law is clear: where an insurance policy conveys conflicting reasonable constructions, it should be construed against the insurer and in favor of coverage. Bosecker, 724 N.E.2d at 244; Kiger, 662 N.E.2d at 947; Eli Lilly, 482 N.E.2d at 470; *see also* Everett Cash Mut. Ins. Co. v. Taylor, 926 N.E.2d 1008, 1014 (Ind. 2010) ("A reasonable construction that supports the policyholder's position must be enforced as a matter of law.").

The second sentence of the endorsement, purporting to severely limit the coverage provided by the first sentence, does not apply to the facts of this case. Responding to its apparant deceptive or illusory effect, the Court finds a narrow possibility of resulting coverage. Even if the second sentence is to be given effect, however, such effect must be constrained by the plain language of the sentence, as discussed above. The second sentence of the endorsement states that there is no coverage for "the transportation of youth or adult participants to and from athletic games or athletic events, including but not limited to practices, exhibitions, post season and

---

[2] Soccer is a team sport requiring well coordinated interaction between teammates in order to achieve playing proficiency. Team-building exercises, such as the one to which the Carmel Commotion was traveling at the time of the accident, are a common means of developing the trust and camaraderie necessary to achieving playing proficiency on the field.

scheduled events." Appellants' App'x at 101. This language, however, does not "clearly and unmistakably" exclude coverage in this case. *See* Taylor, 926 N.E.2d at 1012 ("Although insurers are free to limit coverage to the extent the limitations are consistent with public policy, the exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play."). The policy does not define "athletic games or athletic events," but certain specific examples are identified: "practices, exhibitions, post season and scheduled events." The four examples provided all speak to transportation to and from the soccer field. The Carmel Commotion was not traveling to or from the soccer field at the time of the accident; they were traveling to a team-building activity away from the soccer field. They had finished their games for the day and returned to the hotel in the interim. If such travel was to be excluded, it was the responsibility of *the drafter*, Virginia Surety, to "clearly and unmistakably" bring it within the scope of the exclusionary clause. They did not do so, and thus the policy should be construed to further its basic purpose of indemnity.

Furthermore, it appears that the Court's narrow view of "the business of the IYSA" is somewhat contradicted by the Court's characterization of the second sentence as a mere amplification of the first. Haag, ___ N.E.2d at ___. Reading both sentences of the endorsement together, if "the competition" was unambiguously *not* "in the business of" the IYSA, then there would be no need for such "amplification," and therefore no need to exclude from coverage "transportation . . . to and from athletic games or athletic events."

Because I find that, under the facts of this case, a reasonable construction of the hired auto endorsement supports coverage, which coverage is not diminished by the plain language of the second sentence of the provision, I would reverse the summary judgment entered in favor of the insurance company.