2023 IL App (1st) 210523

SECOND DIVISION
August 29, 2023

No. 1-21-0523

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| *In re* APPLICATION OF THE COUNTY COLLECTOR, | ) | |
| for Judgment and Order of Sale Against Lands and Lots | ) | |
| Returned Delinquent for Nonpayment of General Taxes | ) | |
| And/or Special Assessments for the Year 2015 and Prior | ) | |
| Years | ) | |
| | ) | |
| (Gan C, LLC, | ) | |
| | ) | Appeal from the |
| Petitioner-Appellant and Cross-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | 19 COTD 4458 |
| Maria Pappas, Cook County Treasurer and *ex officio* | ) | |
| Cook County Collector and Nationwide Real Estate | ) | Honorable |
| Investment, Inc., | ) | Maureen O. Hannon |
| | ) | Judge Presiding |
| Respondents-Appellees, | ) | |
| | ) | |
| | ) | |
| | ) | |
| (Nationwide Real Estate Investment, Inc., | ) | |
| | ) | |
| Respondent-Appellee / Cross-Appellant)). | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Gan C, LLC purchased a commercial property at Cook County's annual tax sale. After allegedly discovering that the property was contaminated, Gan C filed a petition for sale in error

under article 21 of the Property Tax Code. See 35 ILCS 200/21-310(b)(4) (West 2020). The circuit court denied the petition, finding that Gan C had not "met [its] burden" under the relevant statute. We agree with the circuit court's interpretation of the statute and its review of the evidence. We thus affirm.

¶ 2                                          BACKGROUND

¶ 3      In 2015, Gan C purchased the delinquent taxes for a strip mall on Dolton Road in Calumet City (the Dolton Property) for approximately $1.4 million. Initially, Gan C assigned the certificate of purchase to another company, Eeservices, Inc. As the assignee, Eeservices attempted to have the transaction declared a sale in error based on an administrative error—the property was listed for auction at "Dolton Avenue" as opposed to "Dolton Road." A different panel of this court agreed with the circuit court that this was not a proper basis for a sale in error. See *In re Application of the County Treasurer & ex officio County Collector*, 2020 IL App (1st) 190014, ¶ 17.

¶ 4      While the Eeservices appeal was pending in this court—and as far as we can tell, completely unbeknownst to this court—Eeservices assigned the certificate of purchase back to Gan C, the original holder. (The principal of Eeservices and the principal of Gan C, as well as the principal of another entity that at one point was assigned this certificate (AJD Tax Liens, LLC), are all the same person, a Mr. Bingham.)

¶ 5      In any event, while the Eeservices appeal was pending before this court, Gan C, now reassigned as the holder of the certificate of purchase, initiated a new action in the circuit court of Cook County. In that action, Gan C again applied for a sale in error, this time not due to an administrative error but due to "the existence of asbestos, lead and black mold" on the property. Attached to the petition was an initial Environmental Site Assessment.

¶ 6     Nationwide Real Estate Investment, Inc. (Nationwide), the owner of the Dolton Property, argued that Gan C's application for sale in error was barred by *res judicata*, given Eeservices's prior application for a sale in error on the same Dolton Property. (The court later found *res judicata* inapplicable; we need not reach this issue.)

¶ 7     The Cook County Treasurer (County) also challenged Gan C's petition. The County first attacked the veracity of the environmental report, claiming its conclusions were "mostly vague and it is unclear how they would constitute a hazardous substance or waste." It then argued that Gan C's application was legally insufficient because it did not meet the requirement of section 21-310(b)(4) in that there was no evidence that Gan C "would be required" to clean up the Dolton Property under any current law or administrative rule or regulation. The County likewise claimed that *res judicata* barred this new application for a sale in error.

¶ 8     In reply, Gan C attached three new environmental reports. The County again attacked these reports, arguing that they contained little more than "vague statements about soil content that could likely apply to any property in Cook County." None of those reports, the County emphasized, contained any expert opinion that the Dolton Property would be subject to government-mandated remediation for violation of any existing environmental law or regulation.

¶ 9     The County also noted that much of the underlying information on which the three new reports relied (oral and written statements, plus photographs) came directly from Gan C's principal, Mr. Bingham. The County attacked Mr. Bingham's credibility, noting a recent incident in which the Calumet City Police arrested three individuals for trespass on the Dolton Property. According to the report, these three individuals had presented fake credentials claiming to be inspectors for Calumet City; when questioned by the police, these individuals claimed that they were sent by Mr. Bingham to obtain samples and conduct testing. Mr. Bingham, when contacted

by the police, acknowledged that he sent those men but was less clear on his knowledge of the false credentials they showed store owners on the Dolton Property. Ultimately, the police handled the matter as an ordinance violation, for which the individuals were cited for solicitation without a license and were given a trespass warning.

¶ 10    In July 2021, the parties appeared for oral argument. The parties argued their respective positions. But Gan C informed the court that it would call a witness, a Mr. Matthew Otto, who authored one of the four environmental reports. Opposing counsel objected; Gan C had given no notice of its intent to call a live witness or that any evidentiary hearing was planned. The County argued that, if the matter was going to proceed to an evidentiary hearing, the County would need time to prepare for Mr. Otto's testimony and perhaps call witnesses of its own—including possibly some of the witnesses involved in the trespass onto the Dolton Property that was the subject of the Calumet City Police report.

¶ 11    The court was willing to let Mr. Otto testify with the caveat that, "to the extent that the [County] wants more time to depose him if for some reason he says something strange or present another witness because this is new material, I'm going to allow that." Gan C considered the court's offer and, after a short recess, withdrew Otto as a witness. Having withdrawn its only live witness, Gan C's counsel proceeded to argue its case on the papers alone.

¶ 12    The court denied the application for a sale in error, ruling that Gan C had not "met their burden." While noting that Gan C had proffered four reports, the court stated that "[n]one of those reports can definitively say that there is a hazardous substance, hazardous waste, or an underground storage tank that would require a cleanup or removal under any federal state, or local law." After counsel for Gan C sought clarification, the court stated:

"I don't think that you have met both prongs of the statute, that you haven't met that there is a hazardous substance, hazardous waste, or an underground storage tank definitively, nor have you identified that there is a federal, state, or local law, ordinance, or regulation that would require cleanup of and removal under the law."

¶ 13    Gan C timely appealed.

¶ 14                                ANALYSIS

¶ 15                                   I

¶ 16    We begin with our standard of review. The parties all agree that the interpretation of a statute is a question of law subject to *de novo* review. *Id.* ¶ 4. Both Gan C and the County say, however, that we should review the court's interpretation of the documentary evidence under the manifest-weight-of-the-evidence standard.

¶ 17    True, we employ the manifest-weight standard to findings of fact after an evidentiary hearing. But here, there was no live testimony and no credibility determinations of witnesses; the matter was decided entirely on documents and written and oral argument. Because we review the exact record presented to the trial court, the trial court is not in a superior position to make findings, and our review is *de novo*. *Cleeton v. SIU Healthcare, Inc.*, 2023 IL 128651, ¶ 26 ("where the circuit court only considered documentary evidence (depositions, transcripts, etc.), *de novo* review applies"); *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009) (where trial court made findings based on purely documentary record and legal argument that is likewise available to reviewing court, "a reviewing court is not bound by the trial court's findings and may review the record *de novo*"); *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007) (when trial court heard no live testimony but only "relied on the parties' oral argument and the record," "we review the court's ruling on this issue *de novo*").

¶ 18    On *de novo* review, we afford no deference to the trial court's decision. *In re Application of the County Treasurer & ex officio County Collector*, 2022 IL App (4th) 190904, ¶ 22. We perform the same analysis as the trial court and may affirm on any basis in the record, regardless of the trial court's reason and regardless of whether the trial court's reasoning was correct. *Khan v. Fur Keeps Animal Rescue, Inc.*, 2021 IL App (1st) 182694, ¶ 25.

¶ 19                                    II

¶ 20    With that clarified, we turn to the merits. Gan C argues that the circuit court erred in denying its petition for sale in error primarily because it accepted the County's erroneous interpretation of section 21-310(b)(4). We agree that it makes the most sense to start with the proper interpretation of the statute before moving to the proof.

¶ 21                                    A

¶ 22    Our primary goal in construing a statute is to give effect to the intent of the General Assembly. *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793, ¶ 35. If the language is clear and unambiguous, we must apply its plain and ordinary meaning. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. We consider the language in context, including the law's purpose, the problems it addresses, and the consequences of construing the statute one way or the other. *Carmichael*, 2018 IL 122793, ¶ 35. We also presume the legislature did not intend absurd or unjust results. *Id.*

¶ 23    As the County notes, "[t]ax revenues are literally the lifeblood of government." *Rosewell v. Chicago Title & Trust Co.*, 99 Ill. 2d 407, 416 (1984). They fund such public services as schools, libraries, and public health facilities. When a property holder fails to pay property taxes, the government may place a lien on the property and ultimately, with court approval, put the property up for auction for its unpaid taxes. Tax sales thus provide the government with a way

"to collect delinquent real estate taxes after conventional means of collecting have failed." *Id.* at 410.

¶ 24     Section 21-310 of the Property Tax Code permits those who have successfully bid on tax sales—holders of the "certificate of purchase"—to attempt to unwind the sale due to various errors or other events either before, during, or after the tax sale. See 35 ILCS 200/21-310 (West 2020); *In re Application of the County Treasurer*, 2022 IL App (1st) 200604, ¶ 16. The statute's purpose is to relieve tax buyers from the effect of *caveat emptor* purchases at tax sales, where the buyers often have less than full knowledge of the property at the time of bidding. *County Treasurer*, 2022 IL App (1st) 200604, ¶ 16. Relevant here, subsection (b)(4) of section 21-310 reads in pertinent part as follows:

> "When, upon application of the owner of the certificate of purchase only, it appears to the satisfaction of the court which ordered the property sold that any of the following subsections are applicable, the court shall declare the sale to be a sale in error:
>
> * * *
>
> (4) The real property contains a hazardous substance, hazardous waste, or underground storage tank that *would require* cleanup or other removal under any federal, State, or local law, ordinance, or regulation ***." (Emphasis added.) 35 ILCS 200/21-310(b)(4) (West 2020).

¶ 25     The parties focus on the italicized language above, "would require," and what it means for the statute. The County argues, as the circuit court implicitly ruled, that the language provides for a sale in error only if the subject property, in its current condition, violates some federal, state, or municipal law, such that environmental remediation would be required if the government were to inspect it. And because Gan C did not demonstrate that, in its current state,

the Dolton Property would be subject to mandatory remediation, Gan C is not entitled to a sale in error.

¶ 26    Gan C, on the other hand, reads the language much more broadly and leans heavily on the fact that "would require" is written in the conditional tense, not the present tense. To Gan C, the statute allows for a sale in error not only if remediation would be *currently* required by law but also more broadly if the subject property "is polluted to the level that there is a law *somewhere* that says under *certain circumstances* that pollutants must be removed." (First emphasis in original, second emphasis added.) The "certain circumstances," in other words, need not be currently present.

¶ 27    We agree with the County and the circuit court and do not find Gan C's interpretation reasonable. The use of the conditional "would require" instead of the present-tense "requires" or "is required" is most reasonably understood as clarifying that, to qualify for a sale in error, the applicant need not show a *current government remediation order in place*. The General Assembly did not want to be so narrow as to limit sales in error only to those rare situations where the local, state, or federal government has *already* stepped in and ordered cleanup or removal—where remediation already "is required." Simply put, by using the words "would require," the General Assembly intended to require the applicant to show that the property, in its current state, violates some environmental law, rule, or regulation requiring remediation—but the applicant need not show that the government has already *found* that violation and required remediation.

¶ 28    As understood, the statute contains a meaningful protection for the unsuspecting purchaser of the tax deed. The applicant need only show that the property is currently in violation of an environmental law or regulation at any level of government, such that

remediation would be required, regardless of whether the government has already taken action on the property. As Gan C notes, the word "any," itself, connotes a broad application; the applicant could point to "any" environmental statute or ordinance or rule or regulation at any level of government—city, county, state, or federal. But that violation must currently exist.

¶ 29 Gan C's interpretation, on the other hand, would result in a nearly limitless application of subsection (b)(4). To Gan C, "even laws that do not address the present conditions on the property," even "a law which requires a cleanup of the hazardous substance *in circumstances different than the actual circumstances* at the time of the petition," could be cited as a basis for cleanup or removal. It is hard to imagine a principled limitation to this reading.

¶ 30 Under Gan C's interpretation, an applicant need only show that, at some point in the future, under different circumstances, cleanup would be required. Play with the facts all you want—change the occupants of the property; change the use of the property; change the zoning of the property; add or subtract whatever information necessary—until you navigate your way to some law or rule that is violated at some level of government, and the sale in error is yours. That is not a reasonable interpretation of subsection (b)(4).

¶ 31 We thus agree with the County and the trial court that Gan C was required to show that the Dolton Property, in its current condition, violates some environmental law or rule that would mandate remediation.

¶ 32                                                                 B

¶ 33 We likewise agree with the County and the trial court that Gan C failed to carry its burden of demonstrating that an existing law or regulation would require remediation of the Dolton Property under current circumstances. We reach this conclusion for several reasons.

¶ 34    First and foremost, for all the hundreds of pages contained in these four reports, including the testing of soil samples and examinations of various physical aspects of the Dolton Property's physical interior, not one of these reports made the concise, straightforward statement that some condition on the Dolton Property is so hazardous as to legally mandate cleanup or removal under an existing federal, state, or local law or regulation. As one might expect of an environmental report, each of these four reports is filled with highly technical language, and to be sure, the reports are liberally sprinkled with words like "hazardous" and "lead" and "mold" and "asbestos" when describing this 103,000-square-foot strip mall and surrounding area. But it would have been a simple matter for the authors of these reports—or some other expert offered by Gan C—to simply identify a statute or administrative regulation of some kind that required remediation under current conditions. The absence of such a statement speaks volumes, itself.

¶ 35    As does the absence of a live expert witness. As the County notes, this case cried out for the live testimony of an expert witness to take all this highly technical data and language and synthesize it into a coherent, understandable explanation for the finder of fact (the trial court, and now us) that the conditions on the 103,000-square-foot strip mall and surrounding property that comprise the Dolton Property are so hazardous as to require environmental remediation under some law or regulation.

¶ 36    True, Gan C presented Mr. Otto as a witness, but it gave no notice to the other parties of this witness. And yet still, the trial court was willing to allow Mr. Otto's testimony, subject to giving time to opposing counsel to depose Mr. Otto, recall him, and/or produce live testimony of its own. Gan C ultimately withdrew the witness, leaving the court with hundreds of pages of scientific discussion but no clear identification of an existing law or regulation that would mandate remediation based on the conditions found at the property.

¶ 37    We have said, on countless occasions, that we will not scour a record on appeal for reasons to overturn a judgment, that the appellant is responsible for citing to specific portions of the record for support of its position; we are ill-equipped and unwilling to undertake that task for the appellant. See Ill. S.Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument shall be supported with citation to authorities and specific pages of record on appeal); *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument."); *In re Estate of Parker*, 2011 IL App (1st) 102871, ¶ 47 ("Reviewing courts will not search the record for purposes of finding error in order to reverse the judgment"); *New v. Pace Suburban Bus Service*, 398 Ill. App. 3d 371, 384 (2010) ("This court is not a repository where the burden of argument and research may be dumped and we will not scour the record to develop argument for a party.").

¶ 38    We feel much the same in this context. When left with hundreds of pages of scientific language and no clear statement that any law requiring remediation has been triggered, we are in no position to wade through these reports in search of a conclusion that Gan C has not offered us in succinct, coherent form. Absent a clear explanation from an expert witness connecting the dots and tying this all together, we are left only with Gan C's attempts in its legal briefs to do so.

¶ 39    But Gan C fares no better in attempting to accomplish by legal argument what it did not accomplish in its reports. For example, Gan C points to the original report it submitted, which recommended that the Dolton Property be enrolled in the Site Remediation Program run by the Illinois Environmental Protection Agency (IEPA). But the County, citing to a description of the program on the IEPA's website, convincingly demonstrated that enrollment in that program is initiated by the landowner, is wholly voluntary, and is tailored to the specific needs of the

applicant landowner. The stated intent of this program is to provide the applicant landowners (called "Remediation Applicants" or "RAs") with

> "the opportunity to receive review and evaluation services, technical assistance and no-further-remediation determinations from the [IEPA]. The [IEPA] intends this program to be flexible and responsive to the requirements of [RAs], to project constraints and to variable remediation site conditions. The goal(s) and scope of actions at Program remediation sites are normally defined by the RA, subject to the regulations."

¶ 40     The IEPA continues to explain in this publication that it is "authorized to provide review, evaluation and approval services for actions at remediation sites where hazardous substances, pesticides, or petroleum may be present and for which the remediation site owner requested such services in writing." And as the County again notes, this same IEPA publication *disqualifies* from the program any property for which remediation is currently required by a federal law, regulation, or court order.

¶ 41     All of this is to say that the report's suggestion that the Dolton Property enroll in this voluntary IEPA program comes nowhere close to demonstrating (or even suggesting) that environmental remediation is currently required on the property. Gan C cites one example where enrollment in the program was not so "voluntary," when the IEPA gave the landowner a choice—enroll in the Site Remediation Program to clean up the leaking tar on the property or face IEPA-ordered cleanup. See *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 147 (2004). In that sense, for the purposes of the landowner's insurance coverage, the landowner's decision was not deemed voluntary, and the landowner was entitled to indemnification for what truly was compelled remediation. *Id.* at 177. But that situation is light years from this one.

¶ 42    Likewise, Gan C cites several federal regulations and some IEPA rules regarding mold, asbestos, and lead. Tellingly, Gan C introduces this discussion by writing: "The following federal and Illinois regulations apply to the federally and Illinois recognized hazardous substances present in the subject property." It is no doubt true that these regulations "apply" to such things as mold, lead, and asbestos. It is not surprising in the least that myriad rules and regulations, if not statutes and ordinances, would cover those topics. But other than citing those regulations with a brief excerpt, Gan C does nothing to demonstrate (or even attempt to demonstrate) that these regulations mandate remediation at present.

¶ 43    The closest Gan C comes to at least trying to meet this standard is its discussion of the presence of lead paint at the Dolton Property. The initial report noted that "large areas of old and chipping paint were observed throughout the building" and elsewhere noted that the author "identified several areas of suspect lead based paints on the subject property."

¶ 44    We can pause right there and ask several questions that were never answered by Gan C. Does "suspect" lead-based paint mean that it might contain lead and it might not? And where was this "suspect" lead-based paint found? The chipping paint was found "throughout the building." That, itself, is vague; we are talking about a 103,000-square-foot strip mall composed of multiple, independent commercial units. Does "throughout the building" mean throughout the entire strip mall or throughout one unit? Likewise, when the report identifies "several areas ***  on the subject property" where the "suspect" lead-based paint was found, it does not provide any specification of the scope. These would have been excellent questions to ask an expert witness under examination. Absent that opportunity, this utter vagueness does little to help Gan C.

¶ 45    In any event, based on those rather vague findings in the original report, Gan C argues on appeal that remediation is currently required because "any deteriorated lead-based paint in any

child-occupied facility such as our subject property is a paint-lead hazard" under a cited federal regulation. Likewise, says Gan C, "[c]hipping lead based paint in a child occupied facility such as ours is also considered a lead-hazard in Illinois" under a cited state law.

¶ 46    Gan C does not elaborate beyond this to explain how this federal regulation or state law applies here, much less that it would mandate remediation. We know from the record that a child daycare center is located in the strip mall, and we will assume (though Gan C does not provide a definition) that a child daycare center would qualify as a "child-occupied facility." But was lead-based paint found in that daycare center? Or was it found on the other end of the 103,000-square-foot strip mall? Again, the report does not say; it would have been an excellent question to ask Gan C's expert witness, had it provided one for examination.

¶ 47    Or is Gan C claiming that the entire, sprawling, L-shaped strip mall—by virtue of having one daycare center as an occupant—is a "child-occupied facility" under the federal regulation it cites, 40 C.F.R. § 745.65(a)(4) (2019)? If so, Gan C makes no attempt to tell us. And again, most notable of all is the absence of any expert in the field to authoritatively tell us that—based on what was found ("suspect lead based paint"), in what quantity (unclear), and where (unknown) —a current law or regulation would require remediation. Or maybe an expert would have told us that one centimeter of lead paint, anywhere in the strip mall, is enough, by itself, to require remediation. But that evidence was never provided.

¶ 48    We have said enough. As the finder of fact, the trial court was entitled to proof presented in a far more concrete fashion than vague references to hazardous substances. Even a layperson—at least one who has owned a house—is somewhat familiar with mold, asbestos, and lead-based paint. But we do not pretend to be experts in this area; we know that these substances can be dangerous but little beyond that. While expert testimony is not necessarily required in all

cases like this, where the connection between the alleged hazard and the violation of a statute or regulation is not patently clear (here, it is not), some specialized knowledge will often be required to connect the dots between the scientific findings and a statutory or regulatory violation. Here, the authors of the four reports—who themselves might well qualify as experts— had the perfect opportunity to indicate a statutory or regulatory violation right in those reports but did not. The finder of fact, here the trial court, could only interpret this absence of proof as a failure to meet the standard under subsection (b)(4) of section 21-310. And sitting in the same shoes as the trial judge, looking at the same evidence on *de novo* review, we easily reach that same conclusion.

¶ 49                                    CONCLUSION

¶ 50     The judgment of the circuit court is affirmed.

¶ 51     Affirmed.

*In re Application of the County Collector*, **2023 IL App (1st) 210523**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-COTD-4458; the Hon. Maureen O. Hannon, Judge, presiding. |
| **Attorneys for Appellant:** | Steven E. Friedman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Cathy McNeil Stein, Jonathon D. Byrer, and Sarah Cunningham, Assistant State's Attorneys, of counsel), for appellee Cook County Collector.<br><br>Emmett R. McCarthy, of Stanko McCarthy Law Group, of Chicago, for other appellee. |